**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Carolyn Ann BURDETTE,**
**Defendant–Appellant.**

**No. 02–5915.**

United States Court of Appeals,
Sixth Circuit.

Jan. 16, 2004.

Robert J. Washko, Asst. U.S. Attorney, U.S. Attorney's Office, Nashville, TN, for Plaintiff–Appellee.

R.N. Bo Taylor, Taylor & Schechter, Goodlettsville, TN, for Defendant–Appellant.

Before ROGERS and COOK, Circuit Judges; and COHN, District Judge.[*]

COHN, District Judge.

This is a criminal case. Carolyn Ann Burdette (Burdette) appeals from her jury conviction for conspiracy to cause another individual to travel in interstate commerce with the intent that a murder be committed in exchange for money and use of an interstate facility with the intent that a murder be committed in exchange for money, both under 18 U.S.C. § 1958, on the following three grounds: (1) her conviction was not supported by sufficient evidence; (2) sexually suggestive photographs were improperly admitted into evidence; and (3) the district court should have departed downward in her sentence because her actions amounted to aberrant behavior and her husband did not want her to be punished. The government argues that the conviction was correct for the following reasons: (1) the evidence was sufficient to sustain the conviction under both counts; (2) the photographs were properly admitted as rebuttal evidence; and (3) the district court was aware of its discretion to depart downward but declined to do so because Burdette's conduct involved significant planning over an extensive period of time. We affirm

## I. BACKGROUND

Burdette married Randy Burdette, a sergeant in the Army, in 1984. While living in Texas in 1992, Burdette met Stephen Adams, another sergeant serving with her husband. Over the next eight years, including a period when Adams and Randy Burdette were both stationed in Germany, Burdette and Adams had an intimate relationship. Adams testified at trial that their relationship was consensual and was initiated by Burdette. Adams said that Burdette often told him that her husband abused her physically, emotionally, and sexually. He also testified that Burdette asked him to kill her husband. Adams' testimony was corroborated by a series of graphic letters written and sent by Burdette to Adams expressing her love for him as well as her dislike for her husband. Sexually suggestive photographs of Burdette were also found in Adams' possession.

Burdette characterized her relationship with Adams differently. She testified that Adams raped her on numerous occasions and threatened to harm her if she reported the rapes to anyone. She said that Adams told her to write the letters, told her what to write, and compelled her to pose for the pictures. She said that she told Adams to leave her alone in November 1998 and stopped sending letters afterwards.

In November 2000, while stationed at Fort Campbell, Kentucky, Adams approached Michael Myott, a fellow serviceman and sniper, about the possibility of killing Randy Burdette. Adams told Myott that Burdette's husband raped and beat her. Adams said that he had tried to kill Burdette's husband three times. Adams told Myott that Burdette had given him a deadline of January 2001 to kill her husband or she would end their affair. Adams asked Myott if he would kill Burdette's husband.

Myott reported the solicitation to John Massie, a Special Agent with the Army's

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

Criminal Investigative Division. Under the direction of Special Agent Massie, Myott told Adams that he knew someone who would kill Randy Burdette for $1500. Massie then had Sergeant John Pace contact Adams posing as a hitman. Pace told Adams to give him $500 as a down payment, information about Randy Burdette's build and vehicle, and a map of his residence and the surrounding area. Adams testified that he got $500 from the bank, called Burdette to get the requested information, and prepared a written map. Adams then met with Pace and discussed having Randy Burdette killed. He gave Pace the money and map. Their meeting was recorded on videotape.

Adams pleaded guilty to conspiracy pursuant to a plea agreement and testified for the government.

Massie also telephoned Burdette, who was living in West Virginia, three times, posing as the hitman and recorded their conversations. In the first conversation on November 18, 2000, Massie said that he and Burdette had a "mutual friend" who wanted something done for him. He asked "when it would be a good time . . . to do this" and said: "You know what we're talking about now?" Burdette responded: "Yeah." Burdette told Massie what kind of car her husband usually drove. She also told Massie that she would make sure that her son Marshall was not in the house on the specified day.

Massie telephoned Burdette again on November 20, 2003. He said that he would make it "look like an accident." When asked whether she could get her children out of the house on the next Tuesday, Burdette replied: "I can try right around noon." Burdette later suggested that the next day was the start of deer hunting season and her husband was "supposed to be out in the back yard in the field" behind their house. She cautioned

Massie that her son would be with him. Massie and Burdette said the following:

MASSIE: Okay. 'Cause with all that open terrain back there, I mean I could, I could get just about anywhere. But do ya'll have a lot of hunting accidents out there?

BURDETTE: Uhm, one or two a year.

. . . .

MASSIE: Ah, I can lay off him, I got a, I got a, ah, we call a M24, it's a, it's a sniper rifle. I can, I mean, from, from that far out I can, I can, I can hit anything.

BURDETTE: Okay. Now he's gonna be in the field tomorrow, and Tuesday he said something about going down to his dads and walking through the woods.

Burdette told Massie what her husband would be wearing. When Massie asked if she was sure about killing her husband, she said yes.

Massie called once again on November 20, 2003. He and Burdette discussed the plan further. When Massie told her that he did not want Adams to back out of paying him the remaining money, Burdette said that Adams would not do that. Massie again asked if Burdette was sure about the plan and she said yes.

Randy Burdette was not killed. Burdette was arrested on November 22, 2000. Randy Burdette testified for Burdette at trial.

Burdette testified that she did not want her husband killed and gave the caller false information so that he would be caught by the police.

Julie and John Neuman, who were friends of Burdette and Adams, testified for the government. They said that Burdette told them that her husband threatened to kill her if she ever left him. Bur-

dette also told them that she loved Adams and he had money to possibly hire someone to kill Randy Burdette. Julie and John Neuman testified that Burdette discussed ways of killing her husband but they did not take her statements seriously.

At trial, the district court initially ruled that the sexually suggestive photographs were inadmissible because they were unduly prejudicial and cumulative as the letters alone established the romantic relationship between Burdette and Adams. Burdette then testified. She said that her relationship with Adams was abusive, Adams raped her on numerous occasions, and he forced her to write the letters and pose for the photographs. The district court then withdrew its earlier ruling and held that the photographs were relevant and admissible to prove the relationship. The district court stated that, at the time of the earlier ruling, there was no evidence questioning the authenticity or genuineness of the letters but Burdette's testimony put the nature of the relationship back in issue.

At the conclusion of the government's proof, Burdette moved for judgment of acquittal. Burdette renewed the motion after the trial was completed. The jury returned a verdict of guilty as to both counts and Burdette's motion was denied.

At sentencing, the two counts were grouped together pursuant to U.S.S.G. § 3D1.2(b) (2001)[1] because they involved the same victim and two or more acts connected by a common criminal objective or scheme. The Sentencing Guidelines

called for a range of 151–188 months.[2] Burdette moved for a downward departure in her sentence because her actions constituted aberrant behavior and Randy Burdette, the victim, did not want her to be punished. The district court denied the motion and imposed a sentence of 151 months imprisonment and two years of supervised release.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

The standard of review for a challenge to the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). When considering the evidence, this Court must allow the government the benefit of all reasonable inferences and must "refrain from independently judging the credibility of witnesses or weight of the evidence." *United States v. Welch*, 97 F.3d 142, 148 (6th Cir.1996). Both circumstantial and direct evidence must be viewed "in a light most favorable to the prosecution." *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002). "Circumstantial evidence alone, if substantial and competent, may support a verdict and need not remove every reasonable hypothesis except that of guilt." *United States v. Talley*, 194 F.3d 758, 765 (6th Cir.1999).

---

1. Because Burdette was sentenced on July 8, 2002, the 2001 Sentencing Guidelines apply. 18 U.S.C. § 3553(a)(4); *United States v. Milton*, 27 F.3d 203, 210 (6th Cir.1994) ("Normally, the sentencing court must use the Guidelines in effect at the time of sentencing.").

2. The statutory maximum under 18 U.S.C. § 1958 is ten years. However, in order to achieve a sentence within the guideline range, the sentence on one count of the conviction was imposed to run consecutively to the extent necessary to produce a combined sentence equal to the total punishment. U.S.S.G. § 5G1.2(d) (2001).

There was sufficient and competent evidence to support Burdette's conviction under 18 U.S.C. § 1958(a), which reads:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life imprisonment, or shall be fined not more than $ 250.000, or both.

### 1. Count One

■ Burdette was found guilty of conspiring to cause another individual to travel in interstate commerce with the intent that a murder be committed. To prove a conspiracy under the murder-for-hire statute, the government must show: (1) Burdette conspired to use an interstate facility with the intent to have Randy Burdette killed in consideration for money to be paid to the killer; (2) Burdette knowingly and voluntarily joined the conspiracy; and (3) a member of the conspiracy performed an overt act. *See United States v. Cope,* 312 F.3d 757, 768 (6th Cir.2002). Burdette says that the evidence was insufficient to show that she and Adams agreed to pay money for the killing of Randy Burdette. Specifically, Burdette says that the only evidence of an agreement to pay money was the discussion between Adams and Myott.

Contrary to Burdette's assertions, however, there was ample evidence at trial showing that she conspired with Adams to have her husband killed in exchange for money. Adams testified that he and Burdette discussed killing her husband on numerous occasions. Adams specifically asked Myott to kill Randy Burdette and paid Pace $500 as a down payment. Adams also gave Pace a description of Randy Burdette, a description of his vehicle, and a map of the area around his residence. Adams said that he obtained this information from Burdette. The recorded conversations between Massie and Burdette also link her to the conspiracy. Burdette told Massie that she would make sure that her son was out of the house at the designated time. She even suggested that the next day was the start of deer hunting season and told Massie where her husband would be and what he would be wearing. Burdette confirmed to Massie that she was sure about killing her husband and told him that Adams would not renege on his promise to pay the rest of the money. Burdette's desire to have her husband killed was also corroborated by the numerous letters that she wrote to Adams.

Burdette says that Adams forced her to write the letters and speak to him by telephone. She says that he conversations with Massie were meant to entrap the person who was trying to kill her husband. On appeal, an appellate court does not judge the credibility of witnesses. *Welch,* 97 F.3d at 148. The jury apparently disbelieved Burdette and believed Adams and Massie. This conclusion was supported by sufficient evidence, including testimony from others such as Julie and John Neuman.

### 2. Count Two

■ Burdette was found guilty of using an interstate facility (telephone) with the

intent that a murder be committed in exchange for money. Burdette says that because the government initiated the telephone calls between Massie (in Kentucky and Tennessee) and Burdette (in West Virginia), the government impermissibly "manufactured jurisdiction," citing *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973). The Second Circuit in *Archer* found that interstate "telephone call[s] manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime" did not meet the interstate element of 18 U.S.C. § 1952(a)(3). *Id.* at 681. The Second Circuit later limited its holding by stating that "when the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves." *Id.* at 685–86. This Court, by contrast, has found no distinction between defendants who initiate a telephone call and defendants who receive a telephone call under statutes that require the use of an interstate facility. *See United States v. Graham*, 856 F.2d 756, 761 (6th Cir.1988) (citing 18 U.S.C. § 1952(a)(3) and 21 U.S.C. § 843(b)).

This case is very similar to *United States v. Williams*, No. 92–5658, 1993 WL 492296 (6th Cir. Nov. 29, 1993), where the Court refused to apply the *Archer* rule. In *Williams*, the defendant Cordelia Williams has her brother Danny ask his friend, Gary Avery, to kill her estranged husband for money. *Id.* at *1. Avery, cooperating with the government, telephoned Williams in Kentucky from a government office in Louisiana. *Id.* During the conversation. Williams agreed to pay $3000 for the killing. *Id.* Williams then sent a $200 money order to Avery as a cash advance. *Id.* The Court held that Avery's telephone calls to Williams merely facilitated the murder-for-hire scheme and were not meant to manufacture jurisdiction. *Id.* at *4.

Like the defendant in *Williams*, Burdette had another individual (Adams) arrange the murder of her husband through an individual who cooperated with the government (Myott). Burdette also spoke with an apparent hitman (Massie) over the telephone. During her telephone conversations, Burdette agreed to the murder for hire, gave Massie essential details about her husband, and assured Massie that Adams would pay the rest of the money. Just like the defendant in *Williams*, Burdette's "phone discussions with out-of-state federal agents were initiated by [the cooperating individual's government contacts] and were only a part of an overall criminal plan to kill an out-of-state husband; the phone calls alone did not create defendant's federal criminal offense." *See id.* at *3.

The government overreaching condemned in *Archer* is simply not present here. Massie did not make the telephone calls to Burdette to manufacture jurisdiction. He made them to ascertain the degree of Burdette's involvement in the scheme, after her participation had been established by Adams' contact with Myott and Pace. Indeed, "[c]ourts that have construed *Archer* have taken pains to limit its applicability and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." *United States v. Wallace*, 85 F.3d 1063, 1065 (2d Cir. 1996) (citations omitted) (finding only two appellate court cases overturning convictions based on *Archer*); *see also United States v. Degan*, 229 F.3d 553, 557 (6th Cir.2000) (refusing to apply *Archer* when the defendant asked an acquaintance to come to his state to plan a murder for hire and the acquaintance allegedly "became a paid federal agent" by cooperating with

the government before traveling to the defendant's home state); *United States v. Hall,* No. 97-5053, 1998 WL 670025 (6th Cir. Sept. 18, 1998) (rejecting a defendant's *Archer* claim where the government-placed call was necessary to the furtherance of the conspiracy but not necessary to ensure the interstate element); *United States v. McLernon,* 746 F.2d 1098, 1107 (6th Cir. 1984) (holding that *Archer* did not apply in a 18 U.S.C. § 1952 case).

Finally, Burdette argues that there was insufficient evidence that she used an interstate facility because the government failed to introduce any telephone records to show interstate communication with Adams. However, the government introduced records of three telephone calls between Burdette and Massie. *See Graham,* 856 F.2d at 761 (holding that there is no distinction between initiating and receiving telephone calls for purposes of finding "use"). Further, Adams testified that he spoke with Burdette by telephone. A rational jury could certainly believe his testimony without the introduction of specific telephone records.

### 3. Conclusion

The evidence introduced at trial was sufficient to support Burdette's conviction on both counts.

### B. Admission of the Photographs

█ The district court's decision to admit the sexually suggestive photographs is reviewed for abuse of discretion. *United States v. Brady,* 595 F.2d 359, 361 (6th Cir.1979). FED.R.EVID. 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "In reviewing a decision of a trial court on this issue we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *Brady,* 595 F.2d at 361.

The district court originally ruled that the sexually suggestive photographs of Burdette found in Adams' possession were inadmissible as unduly prejudicial and cumulative because the letters already established the romantic nature of their relationship. The district court stated that it would reconsider the admissibility of the photographs if the defense reopened the issue. Burdette then testified that her relationship was not consensual, Adams raped her on numerous occasions, and Adams forced her to write the letters. In light of Burdette's testimony, the district court withdrew its earlier ruling and admitted some of the photographs because they contradicted Burdette's characterization of her relationship with Adams.

The probative value of the photographs was not substantially outweighed by the danger of unfair prejudice or needless presentation of cumulative evidence. Adams testified that Burdette initiated their relationship by embracing him, kissing him, and telling Adams that she loved him and not her husband. Adams said that he became intimately involved with Burdette. The letters corroborated Adams' testimony and established the nature of the relationship absent any evidence to the contrary. Burdette's subsequent testimony was directly contrary to Adams' account. She argues that the district court's earlier ruling that the letters were sufficient to establish the romantic relationship should not have changed simply because she testified. However, the probative value of the photographs was substantially increased after she testified because she created a factual dispute on the issue. The district court clearly would

not have admitted the photographs but for Burdette's testimony and theory.

The district court did not abuse its discretion in determining that the probative value of the sexually suggestive photographs in rebutting Burdette's testimony was not substantially outweighed by the potential unfair prejudice and cumulative effect.

### C. Downward Departure

Burdette argues that the district court erred in denying her motion for downward departure. She says that her case was outside the Sentencing Guidelines "heartland" of murder-for-hire cases for two reasons: (1) her actions amounted to aberrant behavior and (2) the victim, Randy Burdette, did not want her to be punished.

A sentencing court may depart downward from a sentencing range when there is a mitigating factor that has not been adequately considered in formulating the Sentencing Guidelines. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0 (2001). A sentencing court's decision not to depart downward is not appealable as long as " '(1) the District Court properly computed the guideline range, (2) the District Court was not unaware of its discretion to depart downward from the guideline range, and (3) the District Court did not impose the sentence in violation of law or as a result of the incorrect application of the Sentencing Guidelines.' " *United States v. Price*, 258 F.3d 539, 547–48 (6th Cir.2001) (citation omitted); *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir.1995). "If the court's refusal to depart stemmed from its legal conclusion that the circumstance argued by the defendant was not a valid reason for departure, the decision is reviewable." *United States v. Prince*, 214 F.3d 740, 766 (6th Cir.2000).

Here, based on the arguments made by Burdette and the government during the sentencing hearing, as well as the statements and questions by the district court, the district court was clearly aware of its authority to grant a downward departure. For example, the district court stated that Burdette's case did not qualify for an aberrant behavior downward departure "because it involved more than a single agreement to try and murder her husband." The district court also stated that it thoroughly considered Randy Burdette's victim impact statement but was concerned because Burdette conspired to kill the father of her children.

Because the district court was aware of its discretion to depart downward and it did not impose the sentence in violation of law, Burdette's appeal on this issue is not reviewable.

### III. CONCLUSION

The evidence was sufficient for a rational jury to convict Burdette of both counts of violating the murder-for-hire statute, the sexually suggestive photographs were properly admitted as evidence rebutting Burdette's testimony, and the district court was fully aware of its authority to depart downward.

Accordingly, Burdette's conviction is AFFIRMED.