*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0217p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            *v.*

RAHIB ISMAEL-YASIR AL-CHOLAN,
            *Defendant-Appellant.*

No. 08-2532

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-20562-001—George C. Steeh, District Judge.

Argued: April 23, 2010

Decided and Filed: May 27, 2010[*]

Before: GUY, BOGGS, and SUTTON, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** David Herskovic, Farmington Hills, Michigan, for Appellant. Leonid Feller, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** David Herskovic, Gerald M. Lorence, Farmington Hills, Michigan, for Appellant. Leonid Feller, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

**OPINION**

_____

BOGGS, Circuit Judge. Defendant Rahib Ismael-Yasir Al-Cholan was caught in a sting operation attempting to purchase the sexual services of a twelve-year-old girl. Al-Cholan was subsequently convicted of traveling in interstate commerce for the purpose

_____

[*] This decision was originally issued as an "unpublished decision" filed on May 27, 2010. On July 19, 2010, the court designated the opinion as one recommended for full-text publication.

of engaging in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). He makes three arguments on appeal: (1) that he was unlawfully entrapped; (2) that his custodial statements to police should have been suppressed because he did not understand the arresting officers' English-language *Miranda* warning; and (3) that the district court improperly imposed a sentence enhancement for a pattern of activity involving prohibited sexual conduct. All three arguments lack merit, and we therefore affirm.

## BACKGROUND

Al-Cholan is an Iraqi native and a former tank mechanic in the Iraqi army under Saddam Hussein. He immigrated to the United States in 1995 after deserting the army and spending a brief period in Saudi Arabia. For the next twelve years, he lived in Dearborn, Michigan, where he married, fathered two children, and worked as a self-employed auto mechanic. In 2002, he incorporated his own business, Cholan, Inc. The following year, he became a United States citizen. By all outward appearances, Al-Cholan was an upstanding individual living the American dream.

But the truth was substantially darker. In October 2007, when Al-Cholan was 45 years old, he befriended Michael Hanna, a 24-year-old Lebanese immigrant, and, according to Hanna, admitted to him that he harbored a predilection for sex with underage girls and boys. As Hanna testified, Al-Cholan claimed that "Lebanese people . . . know how to get . . . young children" for sex and asked him several times to procure a child.[1] Concerned, Hanna related this request to his guardian, who passed it on to the Department of Homeland Security's Immigration and Customs Enforcement division ("ICE"). ICE agents then set up a sting operation using Hanna as a cooperator.

On November 7, 2007, while agents listened in, Hanna told Al-Cholan that he knew of a twelve-year-old girl being prostituted by her uncle in Toledo, Ohio for $100 per session. According to Hanna, Al-Cholan responded that "he [could not] go to Toledo because he [was] afraid that the police would catch him on the road if he ha[d] a minor" and asked "if [the girl] could come over here." Hanna said that she could not.

---

[1]While Hanna testified in English at Al-Cholan's trial, all of his conversations with Al-Cholan were in their native Arabic.

Al-Cholan asked if any other children were available; Hanna said no. With no persuasion or pressure from Hanna, Al-Cholan then decided to accept the offer.

Since Al-Cholan's truck was out of commission, he asked Hanna to drive him to Toledo. En route, Al-Cholan boasted to Hanna that he had had over 100 prior sexual experiences with minors, both in Iraq and in Michigan. At some point, ICE agents realized that the recording device Hanna was wearing had malfunctioned, and directed Hanna via cellular telephone to stop at a gas station. There, the agents met Hanna and fixed the device as Al-Cholan waited obliviously in the car. While at the station, Al-Cholan asked Hanna to purchase Vaseline and condoms, and Hanna did so. After the two men resumed driving, Al-Cholan continued to detail his past sexual molestation of children and his plans to "spend the night" with the twelve-year-old girl.

At approximately 10:00 p.m., Al-Cholan and Hanna arrived at a motel in Toledo, where an ICE agent was posing as the girl's uncle. Al-Cholan paid the agent and briefly conversed with him in English, then attempted to enter the room to which the agent had directed him. Shortly thereafter, he was arrested.

While still on the scene, an agent read Al-Cholan his *Miranda* rights in English, and Al-Cholan signed an English-language *Miranda* waiver form. ICE agents then interviewed Al-Cholan for about ten minutes before transporting him to a nearby police station for further questioning. During this second stretch of questioning, Al-Cholan told several inconsistent stories before admitting that he had come to Toledo to rendezvous with a twelve-year-old girl. After he acknowledged this – about five minutes into the station-house interview – Al-Cholan began "act[ing] like he didn't speak English" and, for the first time, requested an interpreter. The agents immediately terminated the interview.

Al-Cholan was subsequently indicted on one count of traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b). He moved to dismiss the indictment on the ground of entrapment, and the district court denied his motion. He also moved to suppress his custodial statements,

arguing that his *Miranda* waiver was invalid because of his allegedly limited understanding of English.  After an evidentiary hearing, this motion, too, was denied.

Following a jury trial in July 2008, Al-Cholan was found guilty.  He did not request a jury instruction on entrapment, and none was given.  In August 2008, Al-Cholan moved for "a new trial or outright dismissal" on entrapment grounds, among others.  The district court denied the motion. In November 2008, the district court sentenced him to 112 months' imprisonment; the sentence included a five-level enhancement under U.S.S.G. § 4B1.5(b) for having demonstrated a pattern of activity involving prohibited sexual conduct.  This timely appeal followed.

## ANALYSIS

### A.  Entrapment and Related Defenses

Using (and at times conflating) three related but distinct legal theories, Al-Cholan attacks the fundamental fairness of the sting operation that led to his arrest.  These three theories are: (1) the traditional entrapment defense recognized by the Supreme Court in *Sorrells v. United States*, 287 U.S. 435 (1932), and its progeny; (2) the due-process-based "outrageous government conduct" defense, which the Court hinted at in *United States v. Russell*, 411 U.S. 423 (1973), but has never officially recognized; and (3) the "manufactured jurisdiction" defense pioneered in *United States v. Archer*, 486 F. 2d 670 (2d Cir. 1973) (Friendly, J.), but scarcely applied since.

This constellation of related claims is technically governed by two different standards of review.   "Outrageous government conduct" was not specifically argued below, so we review this claim only for plain error.  *See United States v. Dedman*, 527 F.3d 577, 591 (6th Cir. 2008).  Nor did Al-Cholan request an entrapment jury instruction below, so to the extent that he challenges the district court's failure to issue such an instruction sua sponte, we review only for plain error. *See United States v. Presley*, 349 F. App'x 22, 29 (6th Cir. 2009).  Meanwhile, we review de novo the district court's denial of Al-Cholan's pre-trial and post-trial motions based on the purely legal issues of entrapment as a matter of law and manufactured jurisdiction.  *See United States v.*

*Utesch*, 596 F.3d 302, 306 (6th Cir. 2010); *United States v. Budd*, 496 F.3d 517, 530 (6th Cir. 2007).

**1.** *Traditional Entrapment*

In *United States v. Sorrells*, the Court first recognized an entrapment defense under federal criminal law – not as a constitutional imperative, but as a matter of statutory interpretation – reasoning that it "was [not] the intention of the Congress in enacting [the Prohibition Act]" that the statute be used to prosecute otherwise innocent persons "lure[d]" into violating it by law-enforcement agents. 287 U.S. at 448. In subsequent decisions, the Court has recognized that the *Sorrells* entrapment defense is generally available under other provisions of the federal criminal code, while noting that the defense is "not of a constitutional dimension." *Russell*, 411 U.S. at 433; *see also Jacobson v. United States*, 503 U.S. 540 (1992); *Mathews v. United States*, 485 U.S. 58 (1988); *Sherman v. United States*, 356 U.S. 369 (1958).

As we have construed the entrapment defense, "[t]he central inquiry . . . is whether law enforcement officials implanted a criminal design in the mind of an otherwise law-abiding citizen or whether the government merely provided an opportunity to commit a crime to one who was already predisposed to do so." *United States v. Pennell*, 737 F.2d 521, 534 (6th Cir. 1984). Thus, "[a] valid entrapment defense requires proof of two elements: (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity." *United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002). In determining whether a defendant was predisposed to commit the offense, the following factors are relevant:

> [t]he character or reputation of the defendant, including any prior criminal record; whether the suggestion of the criminal activity was initially made by the Government; whether the defendant was engaged in criminal activity for profit; whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducements or persuasion; and the nature of the inducement or persuasion supplied by the Government.

*United States v. Moore*, 916 F.2d 1131, 1137 (6th Cir. 1990) (quoting *United States v. McLernon*, 746 F.2d 1098, 1112 (6th Cir. 1984)).

Setting aside the question of inducement, Al-Cholan's entrapment defense fails because the evidence incontrovertibly establishes that he was predisposed to commit the offense. Al-Cholan approached Hanna unprompted and asked him several times to procure a child. According to Hanna's testimony and Al-Cholan's own recorded statements, Al-Cholan had molested numerous children in the past. And while Al-Cholan momentarily hesitated about *driving to Toledo*, he evidenced no reluctance about *having sex with the proffered child*, and overcame any initial hesitation about the interstate travel with no "Government inducements or persuasion" whatsoever.

In the face of this evidence, Al-Cholan argues that, while he may have been predisposed to molest children, he was not "predisposed to *travel[] across state lines*" in order to do so, since all of the alleged prior instances of molestation occurred within the state of Michigan or overseas, the out-of-state situs for the rendezvous was suggested by the government, and Al-Cholan initially demurred at the proposed location. In other words, he argues that "predisposition" cannot be shown under *Sorrells* and its progeny without specific evidence of inclination to commit every element of the precise crime of conviction, including any federal jurisdictional predicate.

We decline to endorse this narrow and hyper-technical view of predisposition. As the Second Circuit has explained, "[p]redisposition evidence . . . [must be based on] conduct . . . 'near enough in kind to support an inference that [the defendant's] purpose included offenses of the sort charged,' although it is not necessary that the past conduct be precisely the same as that for which the defendant is being prosecuted." *United States v. Brand*, 467 F.3d 179, 200 (2d Cir. 2006) (quoting *United States v. Harvey*, 991 F.2d 981, 994 (2d Cir. 1993) (in turn quoting *United States v. Sherman*, 200 F.2d 880, 882-83 (2d Cir. 1952) (Hand, J.))). In fact, *Brand* involved the very offense at issue here – traveling across state lines for the purpose of engaging in illegal sexual activity with a minor. *Id.* at 182. There, the Second Circuit, applying the aforementioned standard, found that the defendant's mere possession of images of child pornography was conduct

"near enough in kind to support" a predisposition to travel across state lines to have sex with children.  *Id.* at 200 (internal quotation marks omitted).  Here, of course, the predisposition evidence is still closer in fit to the crime of conviction – more than close enough, we hold, to defeat Al-Cholan's entrapment defense.  *See also United States v. Nelson*, 847 F.2d 285, 287 (6th Cir. 1988) (holding that defendant's possession of several books describing explicit underage sex indicated a "predisposition to purchase pedophilic materials" via the mails).

What is more, even under Al-Cholan's strained interpretation of "predisposition," he must lose.  While Al-Cholan briefly hesitated to drive to Toledo, he explicitly voiced his preference that the girl be brought to Michigan instead; this preferred course of conduct was *itself* a violation of the same statute Al-Cholan was ultimately convicted of violating.  *See* 18 U.S.C. § 2423(a) (stating that it is a federal offense to "knowingly transport[ a minor] in interstate or foreign commerce . . . with intent that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense"); 18 U.S.C. § 2423(e) ("conspir[acy] to violate subsection (a) . . . shall be punishable in the same manner as a completed violation").

Accordingly, under either de novo or plain-error review, Al-Cholan's entrapment defense fails.[2]

## 2.  *Outrageous Government Conduct*

In addition to the *Sorrells* theory of entrapment, Al-Cholan argues that the government's conduct was "so outrageous that due process considerations would bar a conviction" *whether or not* he was predisposed to commit the crime.  The Supreme Court has never applied this constitutional variant of entrapment, but has suggested in dictum that it may be available in extreme situations where "[t]he law enforcement conduct . . . [is] shocking to the universal sense of justice. . . ."  *Russell*, 411 U.S. at

---

[2]Al-Cholan's unsupported assertion that he "did not know that . . . Toledo was not in Michigan" is of absolutely no consequence to the predisposition inquiry, whatever the level of specificity required. The violation of 18 U.S.C. § 2423 does not necessitate knowledge that the predicate act of travel involves crossing a state boundary, *see United States v. Feola*, 420 U.S. 671, 676-77 (1975); rather, the interstate element is merely "jurisdictional," *United States v. Chambers*, 441 F.3d 438, 450 (6th Cir. 2006).

431-32 (citing *Rochin v. California*, 342 U.S. 165 (1952)); *but see Hampton v. United States*, 425 U.S. 484, 489-90 (1976) (Rehnquist, J., writing for a three-Justice plurality) (stating that "[t]he remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies solely in the [traditional] defense of entrapment," not in due-process principles).

In this circuit, we have never applied the "outrageous government conduct" defense, and have stated that "there are . . . strong reasons for concluding that such a defense simply does not exist . . . ." *United States v. Tucker*, 28 F.3d 1420, 1427 (6th Cir. 1994). Even if this defense is still available in theory, "in practice, courts have rejected its application with almost monotonous regularity." *United States v. Santana*, 6 F.3d 1, 4 (1st Cir. 1993). In light of the "moribund" state of this defense, *ibid.*, the district court did not commit plain error in failing to raise it sua sponte.

### 3. *Manufactured Jurisdiction*

Al-Cholan also invokes the doctrine of "manufactured jurisdiction," which was recognized by the Second Circuit in *United States v. Archer*. In that case, the defendants were being prosecuted under the Travel Act for a corrupt scheme that occurred entirely within the state of New York, other than the fact that, on one occasion, an undercover agent posing as a participant in the scheme went to New Jersey "for the sole purpose of [engaging one of the defendants] in an interstate telephone call" to satisfy the Travel Act's jurisdictional predicate. 486 F.2d at 674.

Writing for the Second Circuit, Judge Friendly concluded that the *Sorrells* entrapment defense was unavailable because the defendants were predisposed to commit the offense. *Id.* at 682. He briefly considered the due-process-based defense adverted to in *Russell*, but found its applicability inconclusive. *Id.* at 676. In the end, he concluded that reversal was required on a third ground:

> Whatever Congress may have meant by ["uses any facility in interstate or foreign commerce"], it certainly did not intend to include a telephone call manufactured by the Government for the precise purpose of transforming a local bribery offense into a federal crime. . . . [W]hen

> Congress [passed the Travel Act] . . . , it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present.

*Id.* at 681-82.

However, *Archer*'s rule against "manufacturing jurisdiction" can fairly be described as an aberration. Even the Second Circuit itself has effectively limited *Archer* to its facts. *See United States v. Burdette*, 86 F. App'x 121, 127 (6th Cir. 2004) ("[C]ourts that have construed *Archer* have taken pains to limit its applicability and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." (quoting *United States v. Wallace*, 85 F.3d 1063, 1065-66 (2d Cir. 1996))); *see also United States v. Podolsky*, 798 F.2d 177, 181 (7th Cir. 1986) (Posner, J.) ("The course of decisions casts doubt . . . on the vitality of the independent principle announced [in *Archer*] that forbids the 'manufacture' of federal jurisdiction . . . .").

The case law distinguishing *Archer* – and, with vanishingly few exceptions, "*Archer* has been cited only to be distinguished," *Podolsky*, 798 F.2d at 180 – has made clear that

> the "manufactured jurisdiction" concept is properly understood not as an independent defense, but as a subset of three possible defense theories: (i) the defendant was entrapped into committing a federal crime, since he was not predisposed to commit the crime in the way necessary for the crime to qualify as a federal offense; (ii) the defendant's due process rights were violated because the government's actions in inducing the defendant to commit the federal crime were outrageous; or (iii) an element of the federal statute has not been proved, so federal courts have no jurisdiction over the crime.

*Wallace*, 85 F.3d at 1065-66 (internal citations omitted).

As we have already held, the first two of these possibilities have no application in the instant case. And with respect to the third (jurisdictional) possibility, as the Second Circuit has observed, "[c]ourts have refused to follow *Archer* when there is any link between the federal [jurisdictional] element and a voluntary, affirmative act of the defendant," as there clearly was here – even where the government "introduce[d the]

federal element into a[n otherwise] non-federal crime . . . ." *Id.* at 1066. We have employed this same reasoning in rejecting a claim of manufactured jurisdiction. *See United States v. Hudson*, No. 93-2601, 1995 WL 234680, at *3 (6th Cir. Apr. 20, 1995) ("Although [the government] agent suggested that opening a Canadian account would be an effective way to launder money, defendant readily agreed to the scheme. . . . [T]he manufactured jurisdiction defense fails where '[t]he government merely afforded the opportunity, and the defendant chose to seize it.'" (quoting *United States v. Peters*, 952 F.2d 960, 963 (7th Cir. 1992))). Accordingly, the district court did not err by rejecting this defense.

## B.  Adequacy of *Miranda* Waiver

Al-Cholan argues that the district court erred by refusing to suppress his post-arrest statements, since his allegedly "minimal understanding" of English undermined the validity of his *Miranda* waiver. We review the district court's findings of fact with respect to Al-Cholan's suppression motion for clear error, and its ultimate legal conclusion as to the waiver's sufficiency de novo. *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). Because Al-Cholan's motion was denied below, we "review[] the evidence in the light most likely to support the district court's decision." *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009).

Statements made in response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights "voluntarily, knowingly and intelligently." *Colorado v. Spring*, 479 U.S. 564, 572 (1987) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Both the voluntariness and comprehension aspects of the waiver inquiry should be examined "primarily from the perspective of the police," such that where "[the] police had no reason to believe that [the defendant] misunderstood the warnings, . . . there is no basis for invalidating [the] *Miranda* waiver." *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009) (en banc).

While it is true that "language difficulties may impair the ability of a person in custody to waive [his *Miranda*] rights in a free and aware manner," *United States v.*

*Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985), the district court's factual finding that Al-Cholan understood English sufficiently well to render his *Miranda* waiver voluntary, knowing, and intelligent is not clearly erroneous. At the time of these events, Al-Cholan had resided in the United States for twelve years, and the agents knew as much. As part of the naturalization process, he had passed an English proficiency test and sworn under penalty of perjury that he could speak and understand English; the agents knew this as well.[3] The agent posing as the girl's uncle had a brief conversation in English with Al-Cholan, which was captured on tape; during that conversation, the agent specifically asked if Al-Cholan spoke English, and Al-Cholan answered "yes." Al-Cholan signed a written English-language *Miranda* waiver and, according to the agents' testimony, did not indicate any lack of comprehension at the time. Upon arriving at the station-house, Al-Cholan completed an English-language medical questionnaire with no difficulties. He conversed naturally with the agents in English during the interviews. The first sign of any language barrier (whether feigned or genuine) arose only *after* the damaging statements were elicited.

Accordingly, whether or not Al-Cholan truly understood the *Miranda* warnings, the agents certainly had no contemporaneous reason to doubt that he did. Our inquiry necessarily ends there. *See Garner*, 557 F.3d at 263.

## C. Propriety of Sentence Enhancement

Finally, Al-Cholan takes issue with the district court's imposition of a sentence enhancement under U.S.S.G. § 4B1.5(b) on the basis of "a pattern of activity involving prohibited sexual conduct."[4] He styles his argument as a claim under *Blakely v.*

---

[3] Al-Cholan argues, based on his expert witness's testimony, that the citizenship test requires an elementary-school knowledge of English, while the *Miranda* warnings are written at an eighth-grade reading level. Even assuming that this is true, and that the officers should have known as much, Al-Cholan's passing a test requiring *at least* an elementary-school knowledge of English by no means forecloses the possibility that he had a higher level of fluency.

[4] Under the Guidelines, "[a] defendant [has] engaged in a pattern of activity involving prohibited sexual conduct if on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S.S.G. § 4B1.5, comment. (n.4(B)(i)). These two separate occasions may include "the instant offense," and prior occasions need not have resulted in a conviction to qualify. *Id.* (n.4(B)(ii)). "Prohibited sexual conduct" includes federal offenses involving the abuse of children and state-law analogues. *Id.* (n.4(A)).

*Washington*, 542 U.S. 296 (2004), since his sentence was enhanced "based on evidence [not] presented to a jury." Such a claim patently lacks merit, as there is no longer any Sixth Amendment issue with judicial fact-finding under the now-advisory Guidelines. *See United States v. Rita*, 551 U.S. 338, 352 (2007) ("In many cases, the sentencing judge, not the jury, will determine the existence of [sentence-enhancing] facts."); *United States v. Bah*, 439 F.3d 423, 426 n.1 (8th Cir. 2006) ("[J]udicial fact-finding . . . is permitted provided that the guidelines are applied in an advisory manner.") (cited with approval in *United States v. Ferguson*, 456 F.3d 660, 665 (6th Cir. 2006)).

Although Al-Cholan's brief makes a nod toward *Blakely*, the actual gravamen of his argument is that there was insufficient evidence for the district court to have concluded that such a pattern existed. District-court factual findings underlying the imposition of a sentence are reviewed for clear error, *United States v. Ward*, 506 F.3d 468, 472 (6th Cir. 2007), and must be supported by the preponderance of the evidence, *Ferguson*, 456 F.3d at 665.

There is more than enough evidence in the record to support the district court's determination. Primarily, Hanna testified that Al-Cholan had admitted to over 100 sexual experiences with minors in Iraq and in Michigan. Restricting our discussion to conduct within the United States, these minors included a high school girl in Taylor, Michigan; another girl he picked up on Telegraph Road in Detroit; and a Kuwaiti youth who came to Al-Cholan's garage to have his car fixed.

Al-Cholan objects to the hearsay nature of Hanna's testimony, but hearsay evidence is permissible in sentencing proceedings, provided the statements "have some minimal indicium of reliability." *United States v. Manis*, 344 F. App'x 160, 165 (6th Cir. 2009) (stating that "this standard presents a relatively low hurdle" (internal quotation marks omitted)). "[C]orroborating evidence can provide [hearsay] statements with . . . sufficient indicia of reliability," *id*. at 166, and Hanna's testimony was amply corroborated. Several of Al-Cholan's statements about past sexual molestation were caught on audio tape – including his statement that he "d[idn't] go looking for [boys] as much as girls," but that he would take advantage of the opportunity if a boy "fall[s] into

the net," and his story about receiving fellatio from a Kuwaiti youth. Additionally, the government proffered as corroborative evidence a Dearborn police report which described "a man matching Al-Cholan's description, driving a green minivan also matching Al-Cholan's" having made advances on a seven-year-old girl near the same Dearborn Walgreens where, according to Hanna, Al-Cholan trolled for children. Thus, we conclude that the district court did not err in imposing the sentence enhancement.

## CONCLUSION

For the foregoing reasons, Al-Cholan's conviction and sentence are **AFFIRMED**.