NOT RECOMMENDED FOR PUBLICATION
File Name:  17a0465n.06

No. 16-6085

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Aug 09, 2017 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| THOMAS SAYLOR, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: BOGGS, BATCHELDER, and WHITE, Circuit Judges.

BOGGS, Circuit Judge.  This case turns on whether the appellant, Thomas Saylor, was "in custody" for the purposes of *Miranda* when he made incriminating statements to law-enforcement officers in an interview conducted at the halfway house where he lived.  Saylor was the target of a six-month-long federal investigation for his involvement in the possession and distribution of child pornography.  The investigation culminated in the execution of a search warrant at Saylor's home, a halfway house for convicted sex offenders in Louisville, Kentucky.  During the execution of that warrant, law-enforcement officers conducted a brief interview with Saylor, which both parties agree was not preceded by a *Miranda* warning.  Saylor made several incriminating statements about his possession and distribution of child pornography and was subsequently arrested and charged with multiple counts of possessing child pornography and exploiting children, in violation of 18 U.S.C. §§ 2251 and 2252A.  He filed a pretrial motion to

suppress his incriminating statements, which was denied. Saylor pleaded guilty to the charges, reserving his right to file this appeal challenging the district court's denial of his suppression motion, and was sentenced to 300 months in prison. For the following reasons, we affirm the district court's denial of Saylor's suppression motion.

I

A

In August 2013, the Federal Bureau of Investigation (FBI) received a tip from the National Center for Missing and Exploited Children (NCMEC) indicating that Microsoft had reported that a user sent known child pornography to another email address on July 27, 2013. NCMEC had traced the authoring email address to Thomas Saylor, a registered sex offender in Louisville, Kentucky, who had previously been convicted of two sex offenses involving minors: (1) prohibited use of electronic communication to procure a minor for sex, and (2) possession of matter portraying sexual performance by a minor. The FBI agents confirmed Saylor's presence in the sex-offender registry and communicated with his state probation officer, but did nothing further at that time.

In March 2014, the FBI received another tip implicating Saylor, this time from an Immigration and Customs Enforcement (ICE) agent. The agent stated that, in October 2013, an individual emailed an account that had been taken over by ICE agents, requesting to trade child pornography. The individual specifically requested "2/6 yo girls only," and included in the email an image of a prepubescent girl exposing herself to the camera. Subsequent subpoenas for the email address returned the number of a disposable cell phone that was registered in Saylor's name.

In response to this new information, the FBI secured a federal search warrant for Saylor's residence. At this time, Saylor lived in a halfway house for sex offenders in Louisville. On March 27, 2014, a team of approximately ten FBI agents and Louisville Metro Police Department (LMPD) officers, led by Special Agent Tracey Riley, executed the search warrant at Saylor's address. Because the three-story home housed nearly a dozen convicted felons, agents entered the building with their weapons drawn and began directing residents into a central room in order to keep track of everyone. Residents were informed that they could leave if they chose, but they were initially handcuffed for the agents' safety.

During this sweep of the home, an agent spotted Saylor in the hallway outside one of the home's kitchens. Unlike the other residents in the home, Saylor was not immediately handcuffed and escorted to the centralized location. Instead, Special Agent Riley confirmed Saylor's identity, informed him that they were there to execute a search warrant, and asked him if he would be willing to speak with law-enforcement agents in the kitchen. Saylor agreed and entered the kitchen, where he remained under monitoring by an agent standing at the kitchen door until FBI interviewers could arrive at the scene. No one else interacted with Saylor until the interviewers arrived, and at no point was Saylor informed that he was free to leave or read his *Miranda* rights.

After waiting approximately fifteen minutes, Saylor was met by FBI Special Agent Adam Keown and LMPD Detective Shawn Hamilton. The agents offered Saylor water and took seats opposite Saylor at the kitchen table with their backs to the hallway door, which was no longer manned by an FBI agent. In a tactical decision, the agents kept their initial questions vague and generalized, telling Saylor that they simply wanted to discuss his online activity, including several online accounts that they believed belonged to him. As the interview progressed,

however, the agents made it clear that they were there to discuss Saylor's involvement in the trade of child pornography. In the interview, which lasted somewhere between fifteen and thirty minutes, Saylor made a number of incriminating statements regarding his involvement in the transmission of child pornography. He admitted using the email addresses identified by the FBI, sending emails with child pornography attached, and possessing child pornography on his cell phone. When presented with copies of the images that he had sent via his email address, he admitted that they belonged to him and initialed them accordingly at the officers' request. Throughout the interview, Saylor appeared remorseful and avoided making eye contact with the interviewing officers. His remorse gave way to despondence, however, when he threatened to stab himself with the pen that officers gave him to write his confession. This ended the interview.

Because Saylor was not deemed an immediate risk to any nearby children, FBI agents did not arrest Saylor after the interview was completed. At no point did the agents read Saylor his *Miranda* rights or place him under arrest. Although the agents did not inform Saylor that he was free to leave at any time, they insist that he was free to do so. Agents did, however, inform Saylor's probation officer—who, at Special Agent Riley's invitation—observed the execution of the search warrant, of the details of Saylor's confession. After conferring with his supervisor, Saylor's probation officer placed him under arrest immediately following the interview. FBI agents insist that they did not coordinate with the probation officer to have Saylor arrested and did not direct him to do so.

Subsequent to Saylor's arrest, FBI agents executed search warrants on several of the email addresses Saylor admitted using to transmit child pornography. One of the email addresses contained over 4,000 images and 300 movies of child pornography in attachments to

-4-

messages sent to and from that address, including a particularly distressing image of a three-year-old female who had been bound and gagged.

B

Saylor's actions led to a four-count indictment, charging him with violations of 18 U.S.C. §§ 2251 and 2252A.  Saylor filed a pretrial motion to suppress the statements he made to agents on the day that they searched his home, arguing that he was in custody for the purposes of *Miranda* and never read his rights.  A magistrate judge held a hearing and, in a 17-page memorandum, concluded that Saylor was not in custody for the purposes of *Miranda*.  Saylor objected to the magistrate judge's findings, but the district court agreed with the magistrate judge and denied Saylor's suppression motion.  Saylor subsequently pleaded guilty to the charges, but reserved his right to challenge the district court's denial of his suppression motion on appeal.  He was sentenced to 300 months in prison and brings this timely appeal.

II

We review the district court's findings of fact regarding a suppression motion for clear error and its conclusions of law *de novo*.  *United States v. Al-Cholan*, 610 F.3d 945, 953 (6th Cir. 2010) (citations omitted).  Because Saylor's motion to suppress was denied below, we review the evidence "in the light most likely to support the district court's decision."  *Id.* at 954 (quoting *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009)).

A

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court interpreted the Self-Incrimination Clause of the Fifth Amendment "to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves."  *Id.* at 467.  In practice, this places a burden upon state and federal officers to

ensure that a suspect in custody is "adequately and effectively apprised of his rights" and to honor those rights when exercised unless they have been waived. *Ibid.* As the warning of rights and their subsequent waiver are both "prerequisites to the admissibility of any statement made by a defendant," the failure of law-enforcement officers to adequately warn a suspect in custody of his constitutional rights is fatal to the admission of any testimony induced by subsequent police interrogation. *Id.* at 476. If, however, the suspect is not in police custody at the time that the statements are made, then the safeguards of *Miranda* do not apply and the testimony is admissible. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Here, neither party contests that Saylor was interrogated within the meaning of *Miranda* and that he was not read his *Miranda* rights. The only issue is whether Saylor was in police custody when the interview within the halfway house took place. Saylor argues that he was; the United States disagrees.

Whether a suspect is "in custody" for the purposes of *Miranda* is an objective inquiry that asks whether there was "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Considering the totality of the circumstances, "courts focus on the 'objective circumstances of the interrogation' to determine 'how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action.'" *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quoting *Stansbury v. California*, 511 U.S. 318, 323, 325 (1994)). Factors that guide this inquiry include "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the

individual was told she need not answer the questions." *Ibid.* (citing *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003)).

B

The location of Saylor's interview produces the closest question of law in this case. Saylor was interviewed in his home, which is the type of suspect-friendly environment that typically does "not [give] rise to the kind of custodial situation that necessitates *Miranda* warnings." *Id.* at 466 (quoting *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998)). Saylor's home, however, was a halfway house under the authority of the Kentucky Department of Corrections and subject to that department's policies and procedures. *See* 501 Ky. Admin. Regs. 6:020 § 25.6 (defining "Community Service Centers" as including "jails, halfway houses, and residential treatment facilities that house state inmates and parolees"). Saylor argues that these regulations worked to limit his freedom of movement, transforming his home from "a secure redoubt from the cares of the world" into something more akin to a police interrogation room. *Panak*, 552 F.3d at 465.

Although some of these regulations appear quite limiting, it is unclear how many (if any) applied to a probationer like Saylor. For instance, Saylor uses a portion of his brief to highlight a provision in the Kentucky Corrections Policies and Procedures that prohibits escape from a community center, such as a halfway house. Appellant's Br. at 14; *see also* 501 Ky. Admin. Regs. 6:020 § 25.6.II.K. The text of the policy, however, plainly limits its application to *inmates* residing in a community center. Probationers, like Saylor, would presumably be afforded far greater freedom of movement. Saylor would have been subject to the Conditions of

Supervision,[1] a set of policies applicable to probationers and parolees that is promulgated by the Kentucky Department of Corrections. These include subjection to a warrantless search if the probation officer has reasonable suspicion that the probationer possesses contraband and a requirement that the probationer inform his supervising officer within 72 hours if questioned by any law-enforcement official. Although these factors certainly contribute to the creation of the kind of police-dominated atmosphere that triggers *Miranda* protections, it cannot be the case that an individual's home is transformed into a custodial environment by virtue of the fact that the individual is a probationer. In any event, none of the regulations applicable to Saylor rendered him unable to leave the halfway house at the time that the search warrant was executed, and he was generally free to do so when he pleased. In sum, under the circumstances presented, the fact that Saylor's residence was a halfway house does not make it the kind of "inherently intimidating" environment that would have made him feel "constrained or intimidated." *Salvo*, 133 F.3d at 950–51 (holding interviews in a dormitory computer room and a Burger King parking lot chosen by a defendant to be noncustodial).

Saylor also points to the Ninth Circuit's decision in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), which the magistrate judge cited in light of the limited case law dealing with facts similar to those of this case. There, the Ninth Circuit confronted a set of facts rather similar to our own: eight law-enforcement officers executed a search warrant in conjunction with a child-pornography investigation and interviewed the suspect in his home. *Id.* at 1078–79. Although the officers informed him that he was not under arrest and that any statement he made would be voluntary, the Ninth Circuit held that a custodial interrogation had occurred and that *Miranda* warnings were required. *Id.* at 1089. The Ninth Circuit's opinion carries limited force

---

[1] Available at
http://corrections.ky.gov/depts/Probation%20and%20Parole/Pages/InformationforOffenders.aspx

here because it relies on a four-factor test to distinguish custodial from non-custodial interrogations that, although cited, *see e.g.*, *Panak*, 552 F.3d at 466, has not been imported into the law of our circuit.[2]

In any event, this case can be distinguished from *Craighead* on its facts. The Ninth Circuit relied heavily on the number of law-enforcement officers who were dispatched to secure Craighead's home. *Id.* at 1084–85. Although the execution of Saylor's search warrant involved an even greater number of officers, Saylor lived in a halfway house alongside a dozen other convicted felons. Craighead, who lived alone, was far more likely than Saylor to "feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation." *Id.* at 1085. The Ninth Circuit also noted that Craighead was physically restrained by virtue of the fact that his interview took place in a closed-door storage room, with an agent "block[ing] Craighead's exit from the room" throughout the interview. *Id.* at 1086. Here, however, Saylor was interviewed in an open-door kitchen without the presence of an armed guard. Although his interviewers were seated across the table from him, they were not positioned in such a way that for Saylor "to get to the room's only door, he 'would have either had to have moved the police detective or asked him to move.'" *Ibid.* In addition, agents requested Saylor's permission to ask him questions, and he agreed, waiting patiently in the kitchen until investigators were ready to proceed. Craighead, by contrast, was simply directed to the storage room where the interview took place. *Id.* at 1078. Under these circumstances, even if we apply the four-factor *Craighead* test, we would not find that Saylor could succeed in

---

[2] The Ninth Circuit's four-factor test looks at "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which the statements were made." *Id.* at 1084.

showing that his interrogation gave rise to the kind of police-dominated atmosphere that triggers *Miranda* protections.

C

The second factor we consider is the length and manner of questioning. This factor also weighs against Saylor. It is undisputed that the agents interviewed Saylor for a period of fifteen to thirty minutes, well within the window of time that we traditionally consider to be a non-custodial interview. *See Panak*, 552 F.3d at 467 (less-than-an-hour interview was non-custodial); *United States v. Mahan*, 190 F.3d 416, 420, 422 (6th Cir. 1999) (hour-and-a-half interview was non-custodial). Nor do the facts suggest that the interviewing agents employed a hostile or threatening tone with Saylor. On the contrary, Saylor admits that the interview was relatively conversational. *See* Appellant's Br. at 21.

Saylor instead argues that the fact that he was confronted with incriminating evidence makes his interview custodial, again pointing to a Ninth Circuit case, *United States v. Brobst*, 558 F.3d 982 (9th Cir. 2009). In *Brobst*, the Ninth Circuit applied a five-factor test to determine whether an individual was in custody for the purposes of *Miranda*:

> Factors relevant to whether an accused is "in custody" include the following: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual.

*Id.* at 995. The Ninth Circuit concluded that, because the defendant in that case was immediately confronted with evidence that he was involved in the distribution of child pornography, he was more likely to feel that he was in police custody. With *Brobst*, as with *Craighead*, the Ninth Circuit's approach to *Miranda* does not have an exact parallel in our case law. We have never held, for example, that a noncustodial conversation may be transformed into a custodial

interrogation simply by virtue of the fact that police confronted the defendant with evidence of guilt.

On the contrary, we have found interviews to be noncustodial even when the defendant has been made aware of evidence suggesting his guilt. *See Salvo*, 133 F.3d at 952 (holding the interview to be noncustodial even though "the agents told Salvo they knew about Brandon, the boy he wanted to seduce, and Brian, the person he communicated with via [incriminating] e-mail"). Because "[i]t is well-settled that in order to impact upon the custody determination, the communication of [incriminating evidence] must somehow relate to the suspect's freedom of action," *ibid.*, "[e]ven a clear statement from the officer that the person under interrogation is the prime suspect is not in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest," *ibid.* (quoting *Stansbury*, 511 U.S. at 325).

## D

This third factor—whether the defendant possessed unrestrained freedom of movement during the interview— is also close, but on balance favors the government. It is undisputed that, unlike the other residents of the halfway house, Saylor was never placed in handcuffs or otherwise physically restrained. It is also undisputed that Saylor was never told that he could leave at any time, although he was never told that he had to stay, either. Saylor points to two instances in which he can make a plausible case that he was restrained: (1) the fifteen minutes that he spent under watch waiting in the kitchen; and (2) the thirty minutes that he spent seated across the table from investigators during his interview. Neither proves persuasive.

During the roughly fifteen minutes that Saylor waited for his interview in the kitchen, he was monitored by an agent. As Special Agent Riley explained, this was to ensure that "he didn't try to get a knife or something out of the kitchen . . . to harm himself or anybody else."

Moreover, Saylor was monitored to the same or lesser extent that the agents monitored all of the other residents of the house while the search warrant was being executed: "This is not anybody's first search warrant. It's known that we keep eyes on our individuals that are in a house, whether it's male, female, kids, whatever." As the district court noted, this is a common-sense justification that finds some support in our case law. *Cf., e.g.*, *INS v. Delgado*, 466 U.S. 210, 219 (1984) (holding in the Fourth Amendment seizure context that "[t]he presence of agents by the exits posed no reasonable threat of detention" to factory workers who were questioned about their immigration status while on job assignments); *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted"); *United States v. Malcolm*, 435 F. App'x 417, 421 n.1 (6th Cir. 2011) (holding that "general security protocols within the ATF office, which required staff escort for non-ATF visitors" did not place the defendant in custody for the purposes of *Miranda*).

During the roughly thirty minutes that Saylor was interviewed, he sat across the kitchen table from two law-enforcement officers.[3] Saylor argues that they positioned themselves in this way intentionally in order to block his access to the only door leading out of the kitchen. Saylor's argument is significantly weakened by the fact that the record seems to reflect that Saylor had chosen his seat before the officers had even entered the room. One agent testified, "I believe he was already sitting down when I entered the room." The officers' decision to conduct the interview across the table from Saylor—perhaps the most logical positioning for a conversation—does not render the interview custodial merely because it also happened to place them between Saylor and the only available exit. Had the officers intentionally placed Saylor

---

[3] These were the only two officers in the room. The agent previously posted at the door to the kitchen to monitor Saylor was no longer present.

there or maneuvered the table in order to box Saylor in, he might have a stronger case. *See Salvo*, 133 F.3d at 951 (noting that because "Salvo himself selected the locations for the interviews," it indicated that he "felt comfortable" in those places and that thus the interview was not custodial). As the facts stand, however, it does not appear that the officers restrained Saylor's movement in any significant way while they conducted the interview.

E

The final factor asks whether Saylor was told that he did not need to answer the officers' questions. It is undisputed that the officers did not do so. Although this factor cuts against the government, it cannot alone redeem Saylor's cause. "[W]e have never held that [this instruction] is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting." *Panak*, 552 F.3d at 467. After all, "[i]t would be strange . . . to say that a telltale sign of whether an individual must be Mirandized is whether the officer gave the individual one of the *Miranda* warnings." *Ibid.*

In light of the four factors listed above—the location of the interview, the length and manner of questioning, whether Saylor possessed unrestrained freedom of movement, and whether Saylor was told he need not answer the questions—a reasonable person in Saylor's position would not have believed he was detained to a degree associated with formal arrest. Thus, he was not "in custody" for the purposes of *Miranda*, and his motion to suppress was properly denied.

III

For these reasons, we AFFIRM the decision of the district court to deny Saylor's motion to suppress.