RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0097p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

PATRICK ROY WANDAHSEGA,

*Defendant-Appellant*.

No. 18-1219

———————————

Appeal from the United States District Court
for the Western District of Michigan at Marquette.
No. 2:16-cr-00020-1—Paul Lewis Maloney, District Judge.

Argued: May 1, 2019

Decided and Filed: May 21, 2019

Before: CLAY, GILMAN, and KETHLEDGE, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** Clare E. Freeman, THE FEDERAL DEFENSE GROUP, P.L.L.C., La Porte, Texas, for Appellant. Austin J. Hakes, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Clare E. Freeman, THE FEDERAL DEFENSE GROUP, P.L.L.C., La Porte, Texas, for Appellant. Hannah N. Bobee, UNITED STATES ATTORNEY'S OFFICE, Marquette, Michigan, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge. Patrick Roy Wandahsega was convicted by a jury of abusive sexual contact, in violation of 18 U.S.C. § 2244(a)(5), after Wandahsega's

then-six-year-old son, H.D.W., told his grandmother and several others that Wandahsega had touched him inappropriately.  On appeal, Wandahsega argues that the district court erred in allowing H.D.W. to testify by closed-circuit television (CCTV).  He also challenges several of the district court's evidentiary rulings at trial, the court's denial of his motion for a mistrial, and the court's denial of his motion for a judgment of acquittal based on the alleged insufficiency of the evidence.  Finally, Wandahsega contends that his sentence is both procedurally and substantively unreasonable.  For the reasons set forth below, we **AFFIRM** all aspects of the district court's judgment.

## I.  BACKGROUND

**A.  Factual background**

At the time of the events in question, Wandahsega and H.D.W., who are both Native Americans, lived on the Hannahville Reservation in Michigan.  After his mother's death, H.D.W. began splitting his time between his maternal grandparents' home and Wandahsega's apartment.  Wandahsega struggles with substance abuse, having participated in institutional substance-abuse treatment programs on at least four occasions.  While Wandahsega participated in treatment, H.D.W. stayed with his maternal grandparents.

In December 2015, two days after H.D.W. returned to his father's care after Wandahsega had completed a period of substance-abuse treatment, H.D.W. allegedly told his maternal grandmother, Elizabeth Gudwer, that he and Wandahsega "did PK . . . a couple of nights ago."  When Gudwer asked H.D.W. what he meant by "PK," H.D.W. looked down, pointed to his groin area, and said, "just like dad and his girlfriend do."  Gudwer then called Hannahville Child Protective Services (CPS), where a worker told her to contact law enforcement.  Law enforcement in turn told her to take H.D.W. to CPS.  A CPS worker at the Hannahville Tribal Council, Betsy Ruleau, conducted a forensic interview during which H.D.W. did not disclose any abuse.

After H.D.W.'s interview with Ruleau, he returned to his father's care.  That evening, Tonya Maycroft, the mother of Wandahsega's other children, visited Wandahsega's home to ask H.D.W. if he wanted to decorate a Christmas tree with his half-siblings.  H.D.W. ran up to

Maycroft and told her that his father was doing "inappropriate" and "bad things" to him. At that point, Maycroft did not know that H.D.W. had alerted Gudwer to similar behavior. Maycroft brought H.D.W. to her home, asked him additional questions, called law enforcement, and spoke to Gudwer. She then took H.D.W. to the emergency room of the local hospital, where they were met by a police officer.

At the hospital, H.D.W. told Nurse Stacy Smith that his dad "did something bad" to him twice. He also told Dr. Alex Judy that his dad had touched his penis and put a finger up his rectum several days prior to his hospital visit. H.D.W. said that this had happened on two separate occasions. As for physical injuries, H.D.W. said that the alleged assault had hurt a little, but that it did not cause bleeding and that he was not currently in pain. Dr. Judy asked H.D.W. if he could examine H.D.W.'s anus and genital area, but H.D.W. refused. Because H.D.W. said that he was not currently in pain, Dr. Judy did not press him any further. Dr. Judy then ordered urine testing to rule out the possibility of sexually transmitted diseases (STDs).

The day after H.D.W.'s hospital visit, Ruleau conducted a second forensic interview, during which H.D.W. disclosed that Wandahsega had sexually abused him. H.D.W.'s disclosure was consistent with what he had told Gudwer and Maycroft. That same day, FBI Special Agent John Fortunato and a local detective, Justin Hansen, went to Wandahsega's apartment to interview him, but they ended the interview early because Wandahsega appeared to be under the influence of drugs or alcohol. They returned the next day and conducted a recorded interview with Wandahsega. He denied touching his son, but also said that he sometimes blacks out from drinking and therefore did not know what, if anything, he might have done to H.D.W.

Wandahsega consented to a search of his apartment and to the seizure of bed sheets, three pairs of H.D.W.'s underwear, and a blanket from Wandahsega's bedroom, where H.D.W. usually slept. He also consented to providing a DNA sample by cheek swab. The Michigan State Police Forensic Laboratory subsequently found saliva on the inside rear portion of a pair of H.D.W.'s underwear, and testing established that the saliva contained a mixture of both H.D.W.'s and Wandahsega's DNA.

**B. Procedural background**

A federal grand jury proceeded to indict Wandahsega. He was charged with aggravated abuse of a child under twelve-years old, in violation of 18 U.S.C. § 2241(c), and with abusive sexual contact with a child under twelve-years old, in violation of 18 U.S.C. § 2244(a)(5).

*1.    Pretrial motions*

Prior to trial, the government filed a motion under 18 U.S.C. § 3509(b)(1) to let H.D.W. testify through CCTV. A magistrate judge held a hearing and heard testimony from a social worker about whether H.D.W. would be able to testify in front of his father. H.D.W. also testified at the hearing and said that he would be scared to testify with Wandahsega present. After the hearing, the magistrate judge concluded (1) that H.D.W. would be unable to testify in front of his father because of fear, and (2) that there was a substantial likelihood that H.D.W. would suffer emotional trauma if forced to do so. Accordingly, the magistrate judge recommended granting the government's motion and allowing H.D.W. to testify at trial via two-way CCTV. Wandahsega did not object to the Report and Recommendation, which the district court adopted.

The government filed two additional motions in limine. First, it filed a motion for the admission of H.D.W.'s statements to Nurse Smith and Dr. Judy at the emergency room. The government based its request on Rule 803(4) of the Federal Rules of Evidence, which provides an exception to the rule against hearsay for statements made for medical diagnosis or treatment. Second, it filed a motion for the admission of H.D.W.'s statements to Gudwer and Maycroft under Rule 807 of the Federal Rules of Evidence, the residual hearsay exception. That motion also sought the admission of a video recording of Ruleau's second interview with H.D.W. Wandahsega opposed both motions. The magistrate judge ultimately recommended that the evidentiary issues be dealt with at trial after H.D.W.'s testimony and after the initial testimony of Nurse Smith and Dr. Judy. After review, the district court adopted the Report and Recommendation.

## 2.     *The trial*

As its first witness, the government called H.D.W.  H.D.W. was questioned in a room separate from the jury and Wandahsega, and his testimony was transmitted to the jury by CCTV. He testified that he no longer lives with his father because Wandahsega "did something bad to [him]" while he was "in [his] bedroom" in Wandahsega's apartment.  H.D.W. said that Wandahsega touched H.D.W.'s privates—where he "poop[s] and pee[s]"—more than one time and that H.D.W. was telling the truth when he spoke to Nurse Smith, Dr. Judy, and Ruleau. Finally, H.D.W. testified that he preferred living with his grandparents to living with his father, and that he was upset with his father for drinking.

The district court then addressed several outstanding evidentiary issues outside the presence of the jury, including the motions in limine that the magistrate judge had not resolved. First, the court addressed the admission of H.D.W.'s hearsay statements to Gudwer about his father doing "PK" with him like his father and his father's girlfriend did.  Applying the four-part test delineated by Rule 807 of the Federal Rules of Evidence, the court found that H.D.W.'s statements to Gudwer were admissible because they were spontaneous and therefore reliable. Gudwer then testified about her exchange with H.D.W. and what she did in response.

The district court next addressed the admission of H.D.W.'s hearsay statements to Maycroft when she picked him up from Wandahsega's apartment to decorate a Christmas tree. Because H.D.W.'s initial statement to Maycroft that his father was doing bad things to him was spontaneous, the court found it to be reliable and therefore admissible under Rule 807.  But the court found that H.D.W.'s responses to Maycroft's follow-up questions were inadmissible hearsay that did not fall under Rule 807's exception.  Maycroft's testimony was therefore limited to H.D.W.'s initial spontaneous statement to her and what she did in response to H.D.W.'s statement.

The district court then addressed the statements that H.D.W. made to Nurse Smith and Dr. Judy at the hospital with the government assuring the court that those witnesses would testify that their questions to H.D.W. were pertinent to medical diagnosis and treatment.  After reviewing the relevant caselaw, the court held that Nurse Smith's and Dr. Judy's testimony about

H.D.W.'s statements at the hospital would be admissible under Rule 803(4) if a proper foundation was laid. Nurse Smith and Dr. Judy proceeded to testify about their exchanges with H.D.W. at the hospital.

Finally, the district court addressed the recording of H.D.W.'s second forensic interview with Ruleau. The court found that the interview did not contain the same indicia of reliability as H.D.W.'s statements to Gudwer and Maycroft, so it concluded that the interview was inadmissible hearsay. Ruleau, however, later testified in a general manner that H.D.W. disclosed abuse during that interview, and that what H.D.W. told her was consistent with what he had previously told Gudwer and Maycroft.

An additional evidentiary issue arose on the second day of trial. Wandahsega sought to show the jury a video of a supervised visit between H.D.W. and Wandahsega that occurred several months after H.D.W.'s allegations. In that video, H.D.W. interacted well with his father and hugged him. The district court concluded that the video did not fall under any exception to the rule against hearsay and that it was therefore inadmissible. Although the video itself was not admitted, Ruleau, who supervised the visit, testified about the visit and confirmed that H.D.W. and Wandahsega hugged and got along well.

The remainder of the government's fact witnesses were law-enforcement officers. Special Agent Fortunato and Detective Hansen testified about their interview of Wandahsega and the collection of evidence from Wandahsega's apartment. In response to a question about whether he was aware of Wandahsega's drinking problem before he arrived at Wandahsega's apartment, Fortunato commented about a "prior incident where [Wandahsega] had passed out and he had engaged in a homosexual act." Officer Gregory Kurtz, the Hannahville officer who received Gudwer's initial complaint against Wandahsega, also testified briefly about his conversation with Gudwer and the events that resulted from that call.

The government next presented several expert witnesses. They included forensic scientists at the Michigan State Police forensic laboratory, who explained the results of the fluid and DNA testing done on H.D.W.'s underwear. A child-adolescent forensic interviewer with the FBI testified about the legitimacy of the techniques used in Ruleau's interviews of H.D.W.

Finally, a toxicology expert testified about blackouts, alcohol's effect on short-term memory, and a person's ability to complete certain tasks while intoxicated.

Near the end of the government's case, Wandahsega moved for a mistrial based on Fortunato's statement about Wandahsega passing out and engaging in a homosexual act. Wandahsega argued that Fortunato had made the statement to prejudice the jury. The district court ruled that Fortunato's statement was responsive to the question that Wandahsega's counsel had asked, but gave counsel the opportunity to stipulate to striking the statement from the record. When the parties did not stipulate to striking the statement, the court denied the motion for a mistrial. Wandahsega also moved for a judgment of acquittal at the end of the government's case, which the court denied.

At trial, Wandahsega did not testify or call any witnesses. After four days of trial, the jury convicted Wandahsega of abusive sexual contact under 18 U.S.C. § 2244(a)(5), but acquitted him of aggravated abuse of a child under 18 U.S.C. § 2241(c).

### 3.    *Sentencing*

The United States Probation Office prepared and filed a Presentence Report (PSR) prior to Wandahsega's sentencing. Section 2A3.4(c)(1) of the United States Sentencing Guidelines provides that if an offense involves "criminal sexual abuse or attempt to commit criminal sexual abuse," then the sentencing court should apply § 2A3.1 of the Guidelines. The PSR therefore recommended applying § 2A3.1 to calculate Wandahsega's offense level because his conduct involved criminal sexual abuse. Applying § 2A3.1, the PSR recommended an offense level of 36. The PSR also recommended applying a five-level enhancement for engaging in a pattern of prohibited sexual conduct under § 4B1.5(b)(1) of the Guidelines, resulting in an offense level of 41.

Wandahsega objected to the PSR's Guidelines calculation and reiterated his objections at his sentencing hearing. Both parties presented evidence to the district court, after which the court made factual findings and overruled Wandahsega's objections. The court agreed with the PSR's recommendations of an offense level of 41 and determined that the advisory Guideline range was 360 months to life imprisonment. But the court granted Wandahsega's request for a

four-level downward variance because it concluded that a sentence within the Guideline range was "greater than necessary" under 18 U.S.C. § 3553(a). Accordingly, Wandahsega's offense level dropped from 41 to 37, and the final advisory Guideline range was 235 to 293 months' imprisonment. The court imposed a sentence of 288 months. Wandahsega filed a notice of appeal on the same day that the court entered its judgment.

## II. ANALYSIS

### A. Standards of review

The issues in the present case involve multiple standards of review. As a general matter, we review the district court's factual findings under the clear-error standard. *United States v. Katzopoulos*, 437 F.3d 569, 574 (6th Cir. 2006). "[L]egal conclusions are reviewed de novo." *United States v. Smith*, 182 F.3d 473, 476 (6th Cir. 1999).

Evidentiary rulings are reviewed under the abuse-of-discretion standard. *United States v. Phibbs*, 999 F.2d 1053, 1078 (6th Cir. 1993). The abuse-of-discretion standard also applies to the district court's decision not to grant Wandahsega's motion for a mistrial, *see United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994), and to the reasonableness of Wandahsega's sentence, *see United States v. Studabaker*, 578 F.3d 423, 430 (6th Cir. 2009).

### B. H.D.W.'s testimony through CCTV

The district court allowed H.D.W. to testify through CCTV after the magistrate judge held a hearing and issued a Report and Recommendation on the issue. Wandahsega argues that the court erred in allowing H.D.W. to testify outside of the courtroom because (1) the magistrate judge's factual finding that H.D.W. was "unable to testify because of fear" and that there was "a substantial likelihood, established by expert testimony, that the child would suffer emotional trauma from testifying," *see* 18 U.S.C. § 3509(b)(1)(B), constituted clear error, and (2) the CCTV testimony violated Wandahsega's constitutional rights to confront the witnesses against him and to the due process of law.

In response, the government points out that Wandahsega failed to object to the magistrate judge's Report and Recommendation. It also contends that the magistrate judge's factual

findings did not constitute clear error and that H.D.W.'s testimony did not violate Wandahsega's constitutional rights.

In this circuit, the failure to object to a magistrate judge's Report and Recommendation results in a waiver of appeal on that issue as long as the magistrate judge informs the parties of the potential waiver. *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (holding that the Sixth Circuit's waiver rule is within its supervisory powers). This court may, however, "decline to apply the waiver rule where the district court's error is so egregious that failure to permit appellate review would work a miscarriage of justice." *United States v. 1184 Drycreek Rd.*, 174 F.3d 720, 726 (6th Cir. 1999); *see also Thomas*, 474 U.S. at 155 ("[B]ecause the [*Walters*] rule is a nonjurisdictional waiver provision, the Court of Appeals may excuse the default in the interest of justice.").

Wandahsega does not dispute that he failed to object to the magistrate judge's Report and Recommendation regarding H.D.W.'s CCTV testimony. Nor does he dispute that the Report and Recommendation included an explicit notice to the parties that objections "must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation," and that "[f]ailure to file timely objections constitutes a waiver of any further right to appeal." Rather, Wandahsega argues that not excusing the default would result in a miscarriage of justice because utilizing CCTV "violates the Sixth Amendment in eviscerating the bedrock guarantee of confrontation."

Wandahsega has not provided a sufficient reason for us to excuse his waiver in the interest of justice. The fact that his constitutional rights are at issue does not in and of itself make our decision to decline to entertain his waived arguments a miscarriage of justice. *See, e.g.*, *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that a challenge to a denial of a Fourth Amendment motion to suppress was waived for failure to object to the Report and Recommendation); *Trzebuckowski v. City of Cleveland*, 319 F.3d 853, 855 (6th Cir. 2003) (holding that a challenge to a dismissal of a due-process claim was waived for failure to object to the Report and Recommendation).

Moreover, even if Wandahsega were allowed to contest the district court's decision to let H.D.W. testify by CCTV, each of his arguments would fail. The magistrate judge's factual findings that (1) H.D.W. was unable to testify in front of his father because of fear, and (2) there was a substantial likelihood that he would suffer emotional trauma from testifying in front of his father, were not clearly erroneous. H.D.W. told both the magistrate judge and the government's expert witness that he would be scared to testify in front of his father. And the expert witness, who had extensive experience in assessing trauma in children who have been sexually abused, formed an individualized opinion that H.D.W. would suffer trauma if he had to testify in front of Wandahsega.

Finally, Wandahsega contends that H.D.W.'s CCTV testimony violated Wandahsega's constitutional rights to confront the witnesses against him and to due process. But the Supreme Court held in *Maryland v. Craig*, 497 U.S. 836 (1990), that such CCTV testimony is constitutional as long as the government "makes an adequate showing of necessity." *Id.* at 855. In response to *Craig*, Congress passed 18 U.S.C. § 3509, which codifies *Craig*'s requirement that the trial court "hear evidence and determine whether use of [CCTV] is necessary to protect the welfare of the particular child witness who seeks to testify" and whether "the child witness would be traumatized . . . by the presence of the defendant." *Id.* at 855–56.

Although various courts and scholars have struggled to reconcile *Craig* with the Court's subsequent holding in *Crawford v. Washington*, 541 U.S. 36 (2004) (ruling that the Confrontation Clause prohibits the admission of testimonial out-of-court statements unless the witness is unavailable and the defendant had a prior opportunity for cross-examination), *Crawford* did not overturn *Craig*. *See United States v. Cox*, 871 F.3d 479, 492 (6th Cir. 2017) (Sutton, J., concurring) ("*Crawford* did not overturn *Craig*. And *Craig* governs us here, as junior courts may not overrule the handiwork of their superiors."). We are therefore bound by *Craig*, and because the district court's decision to allow H.D.W. to testify by CCTV complied with the requirements of *Craig* and § 3509, Wandahsega's constitutional argument fails.

**C. Hearsay testimony of Dr. Judy and Nurse Smith**

Wandahsega next challenges numerous evidentiary rulings made during his trial. First, he challenges as hearsay the admission of Dr. Judy's and Nurse Smith's testimony, in which they discussed what H.D.W. told them at the hospital. The district court allowed both witnesses to testify about what H.D.W. told them under the "statement made for medical diagnosis or treatment" exception to the rule against hearsay. *See* Fed. R. Evid. 803(4).

Rule 803(4) provides that a hearsay statement that "(A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause" is "not excluded by the rule against hearsay." Wandahsega contends that the district court abused its discretion in admitting the testimony of Dr. Judy and Nurse Smith regarding H.D.W.'s statements to them because Maycroft, according to Wandahsega, took H.D.W. to the hospital for investigatory purposes rather than for medical treatment.

The record does not support Wandahsega's contention. Nurse Smith testified at trial that, in response to her question to H.D.W. about why he was at the emergency room, H.D.W. told her that "[his] dad did something bad to [him] twice." That statement is hearsay, but Nurse Smith explained that asking patients "what brings them [to the emergency room] to be seen" is an important part of the triage process "[b]ecause it helps [the staff] determine what type of needs they need medically, physically, mentally, and how fast they go in the back to be evaluated by a physician." She also testified that when someone arrives at the emergency room and says that they have been sexually assaulted, the identity of the perpetrator is important because it would affect their diagnosis and treatment in terms of mental-health or emotional-health concerns.

The record reflects that Nurse Smith "undertook her interviews for the primary purpose of medical diagnosis, rather than for some other purpose, such as determining whether to notify state authorities of suspected abuse . . . ; deciding whether a protective order was necessary to ensure the [child's] safety, . . . ; or obtaining evidence." *See United States v. Kappell*, 418 F.3d 550, 556–57 (6th Cir. 2005). Nurse Smith never indicated that she was speaking with H.D.W. for any purpose other than to determine how to proceed with his medical treatment. The district

court therefore did not abuse its discretion in concluding that the government had laid a proper foundation for Nurse Smith's testimony and that her testimony was admissible under Rule 803(4).

Next, Dr. Judy testified that H.D.W. related that his father "had touched him inappropriately, touched his penis and put his finger up his rectum on occasion." Dr. Judy then decided that he needed to determine whether H.D.W. had suffered any physical injuries from the assault or contracted any STDs. Wandahsega argues that because Dr. Judy never physically examined H.D.W., the latter's statements to Dr. Judy were not made for medical diagnosis or treatment. But Dr. Judy explained that he sought H.D.W.'s consent to be examined, and that H.D.W. refused. Because H.D.W. said that he was not currently in pain, Dr. Judy did not press him any further.

The record supports the district court's conclusion that Dr. Judy's conversation with H.D.W. was for the purpose of medical diagnosis or treatment. Although Dr. Judy never examined H.D.W., he asked questions to determine the urgency of a physical examination and ultimately concluded that making H.D.W. uncomfortable was unnecessary. Dr. Judy also ordered STD tests based on the information that H.D.W. had given him. The fact that a police officer accompanied Maycroft and H.D.W. to the emergency room does not change the nature of Dr. Judy's questions. In fact, Dr. Judy never indicated that he spoke with the police officer about H.D.W.'s statements.

Wandahsega nevertheless argues that, in order for the hearsay statements of a "very young declarant" to be admissible under Rule 803(4), the child must display the "selfish subjective motive" necessary to establish the reliability of his statements to medical personnel. In other words, Wandahsega argues that the record must demonstrate that the child understood that he or she was speaking with medical personnel for the purpose of medical treatment. He cites *United States v. Turning Bear*, 357 F.3d 730, 738 (8th Cir. 2004), for this proposition. The district court directly addressed Wandahsega's argument, concluding that the Eighth Circuit precedent does not control because, in *Kappell*, the Sixth Circuit "clearly [did] not adopt that prong of the Eighth Circuit opinion."

In *Kappell*, this court affirmed the admission of children's statements to a psychotherapist and a social worker without analyzing whether the children understood the medical context of the interaction. *Kappell*, 418 F.3d at 557. The district court therefore correctly concluded that *Turning Bear* is not persuasive authority. And even if *Turning Bear* were deemed applicable to the present case, which it is not, Nurse Smith and Dr. Judy both testified that they were wearing scrubs and nametags while speaking with H.D.W. Dr. Judy explained to H.D.W. that he was a physician and asked if he could perform a physical exam. Nurse Smith explained that she was a nurse. These circumstances support the proposition that H.D.W. understood that he should tell the truth because he was at the hospital speaking with medical personnel for the purpose of medical diagnosis and treatment. We therefore conclude that the court did not abuse its discretion in admitting the hearsay testimony of Dr. Judy and Nurse Smith.

**D. Hearsay testimony of Gudwer and Maycroft**

Wandahsega's second evidentiary challenge is to the admission of testimony from Gudwer and Maycroft that included hearsay statements from H.D.W. accusing his father of sexual abuse. The district court ultimately admitted the hearsay statements under Rule 807(a) of the Federal Rules of Evidence, the "residual exception" to the rule against hearsay.

> Rule 807(a) provides that
>
> [u]nder the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804: (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Regarding the first factor of Rule 807(a)'s four-part test, Wandahsega's brief highlights reliability issues when children are interviewed about potential abuse, including potential inaccuracies due to suggestive questioning techniques and children's general motivation to please their interviewers.

The Supreme Court listed the following factors as particularized guarantees of trustworthiness in the context of child sexual abuse: "(1) spontaneity; (2) consistent repetition; (3) the mental state of the declarant; (4) the use of terminology unexpected of a child of similar age; and (5) the lack of a motive to fabricate." *Stuart v. Wilson*, 442 F.3d 506, 522 (6th Cir. 2006) (citing *Idaho v. Wright*, 497 U.S. 805, 821–22 (1990)). As the district court explained during its application of Rule 807(a) at trial, H.D.W.'s statements to Gudwer and Maycroft were reliable because they were not made in an interview setting. During the course of a normal conversation with Gudwer, H.D.W. stated that he and his father "did PK." That statement was both spontaneous and used terminology ("doing PK") unexpected of a child of a similar age. And each of Gudwer's follow-up questions—"What is PK?" and "What do you mean?"—were nonleading. *See id.* at 523 (stating that questions that "were not leading or suggestive" are more likely to be trustworthy).

Similarly, when H.D.W. told Maycroft that his father was doing bad things to him, he had just run up to greet her after she arrived at his home. As the district court concluded, such a "spontaneous statement . . . has some equivalent circumstantial guarantees of trustworthiness." The court also limited Gudwer's testimony to that spontaneous statement, and did not allow her to testify about H.D.W.'s answers to her follow-up questions. The spontaneity of H.D.W.'s statements, in tandem with the fact that H.D.W. consistently repeated his accusations to Gudwer, Nurse Smith, Dr. Judy, Ruleau, and the jury, support the proposition that H.D.W.'s initial statement to Maycroft was also trustworthy under the first part of Rule 807(a)'s test. *See id.* at 522 (listing consistent repetition as a particularized guarantee of trustworthiness).

Wandahsega, however, argues that the testimony of Gudwer and Maycroft was not trustworthy under the first prong of Rule 807's test because both witnesses dislike Wandahsega and therefore had a reason to cast him in a negative light. But Wandahsega's counsel had the opportunity to cross-examine both Gudwer and Maycroft about their respective relationships with Wandahsega, and the jury had the opportunity to evaluate their credibility.

Wandahsega next contends that the third prong of Rule 807(a)'s test was not met. Because H.D.W. himself testified at trial, Wandahsega argues that H.D.W.'s hearsay statements to Gudwer and Maycroft were not the most probative evidence available as to whether

Wandahsega abused him.  But H.D.W.'s statements to Gudwer and Maycroft are more probative regarding Wandahsega's conduct than H.D.W.'s testimony alone.  At trial, the only detail that H.D.W. was able to provide about the alleged abuse was that Wandahsega had touched his privates more than one time.  He said that he did not remember when the alleged abuse had happened, but when he spoke to Gudwer he told her that it had happened "a couple of nights ago."  Gudwer's testimony therefore filled in details of H.D.W.'s testimony that were highly probative.

Regarding H.D.W.'s statement to Maycroft, she was the person who took H.D.W. to the hospital.  Her testimony about those events would have been disjointed and incomplete if she had not been able to explain that H.D.W. first told her that his father had done something bad to him.  And the district court was careful to "draw the line" at H.D.W.'s first statement to Maycroft, excluding any statements that did not "really advance the ball too much" in terms of probativeness.  In sum, the district court did not abuse its discretion in admitting H.D.W.'s hearsay statements to Gudwer and Maycroft under the residual hearsay exception.

**E.  Video of H.D.W.'s supervised visit with Wandahsega**

Wandahsega's third evidentiary challenge is to the district court's decision to deny Wandahsega the opportunity to present to the jury a video of a supervised visit between H.D.W. and Wandahsega.  In the video, H.D.W. and Wandahsega had a visit at the Hannahville CPS Office while the present case was under investigation, and H.D.W. hugged and interacted well with Wandahsega.  Wandahsega sought to admit the video to demonstrate that H.D.W. was not afraid of his father.  The district court concluded that the video did not fall under any exception to the rule against hearsay, but it allowed Wandahsega's counsel to cross-examine Ruleau, who supervised the visit, about what happened.  Ruleau testified that, during the visit, H.D.W. and Wandahsega hugged and got along well for 30 or 40 minutes.

Wandahsega contends that the district court abused its discretion by not allowing the video to be played for the jury because Rule 106 of the Federal Rules of Evidence provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded

statement—that in fairness ought to be considered at the same time." But the government did not introduce any portion of the video in question, making Rule 106 inapplicable. Rule 106, furthermore, does not transform inadmissible hearsay into admissible evidence. *United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982) ("Rule 106 is intended to eliminate the misleading impression created by taking a statement out of context . . . ; it is not designed to make something admissible that should be excluded."). Because the video falls under no exception to the rule against hearsay, Rule 106 provides no help to Wandahsega.

Wandahsega also argues that the video should have been admitted under Rule 807(a), the residual hearsay exception. But Wandahsega failed to establish, either at trial or in his brief, that the video met the four requirements of Rule 807(a): that the statement (1) has "circumstantial guarantees of trustworthiness;" (2) "is offered as evidence of a material fact;" (3) "is more probative on the point for which it is offered than any other evidence; and (4) "will serve the purposes of the rules of evidence and the interests of justice." Specifically, Wandahsega failed to explain why Ruleau's testimony about the visit was less probative than the video. The district court therefore did not abuse its discretion in excluding the video of H.D.W.'s supervised visit with Wandahsega.

**F. Wandahsega's motion for a mistrial**

Wandahsega next argues that the district court abused its discretion by denying his motion for a mistrial after Special Agent Fortunato, one of the officers who interviewed Wandahsega the day after H.D.W.'s hospital visit, testified that he "knew about a prior incident where [Wandahsega] had passed out and . . . engaged in a homosexual act." Fortunato's testimony was in response to the following question from Wandahsega's counsel: "And you were aware, were you not, before you even went [to Wandahsega's home] that he had a significant drinking problem?"

Wandahsega argued at trial that Fortunato's testimony was not responsive to the question and was meant to prejudice the jury against Wandahsega. He therefore moved for a mistrial based on "prosecutorial misconduct on the part of the agent." The court denied the motion because it concluded that Fortunato's testimony *was* responsive to the question that

Wandahsega's counsel had asked him. Wandahsega's counsel did not move to strike the statement from the record or attempt to reach an agreement with the government to do so.

On appeal, Wandahsega contends that Fortunato's testimony violated his due-process right to a fair trial and that Fortunato's testimony "may have been injected intentionally to prejudice Mr. Wandahsega." This court has adopted a two-step approach for determining when prosecutorial misconduct warrants a new trial. First, we must "consider whether the prosecutor's conduct and remarks were improper." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001). If the conduct was improper, "the court must then consider and weigh four factors in determining whether the impropriety was flagrant and thus warrants reversal[:] . . . (1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong." *Id.*

Wandahsega has the better argument on the first step of this analysis. The question was whether Fortunato was aware of Wandahsega's drinking problem, and the response about Wandahsega engaging in a homosexual act was not responsive to that question. But even assuming that Fortunato's testimony was improper and prejudicial, the balance of the remaining factors weighs against a mistrial. The remark was isolated and not extensive. Fortunato did not expound upon the alleged homosexual act, even when asked to do so on recross examination by Wandahsega's counsel, and no other witness discussed Wandahsega's sexual orientation after Fortunato's testimony.

In addition, the remainder of the evidence against Wandahsega was strong. Five witnesses testified that H.D.W. told them about the sexual abuse, and H.D.W. himself testified about that abuse. In sum, the district court did not abuse its discretion in denying Wandahsega's motion for a mistrial.

## G. Sufficiency of the evidence

Wandahsega's final evidentiary challenge relates to the proof supporting his conviction for abusive sexual conduct under 18 U.S.C. § 2244(a)(5). He points to various alleged

deficiencies:    (1) the possibility that the DNA evidence found on H.D.W.'s underwear was contaminated when it was transferred by the police or in the wash; (2) the reliability of child witnesses; (3) the witnesses' "controversial relationships" with Wandahsega; (4) a lack of testimony that Wandahsega engaged in sexual contact with H.D.W., as opposed to generally doing "something bad" to him; and (5) a lack of evidence surrounding Wandahsega's specific intent to engage in sexual activity with H.D.W.  Wandahsega moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure at trial, which the district court denied.

"[W]hen the sufficiency of the evidence is challenged on appeal, the standard of review is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  The elements of abusive sexual contact under 18 U.S.C. § 2244(a)(5) are:  (1) knowingly engaging in sexual contact with another person; (2) at the time of the sexual contact, the other person had not yet reached the age of twelve years; and (3) the sexual contact occurred within the territorial jurisdiction of the United States.  By stipulation, the parties agreed that the only element at issue was whether Wandahsega had engaged in sexual contact with H.D.W.  "[T]he term 'sexual contact' means the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person."  18 U.S.C. § 2246(3)

Even without the DNA evidence or H.D.W.'s direct testimony, the government produced sufficient evidence to allow a rational trier of fact to find beyond a reasonable doubt that Wandahsega knowingly engaged in sexual contact with H.D.W.  Gudwer testified that when she spoke with H.D.W. about "PK," he looked down and pointed to his groin area and said, "just like dad and his girlfriend do."  And Dr. Judy testified that H.D.W. told Dr. Judy that his (H.D.W.'s) dad "had touched him inappropriately, touched his penis and put his finger up his rectum on occasion."

Regarding Gudwer's, Maycroft's, and H.D.W.'s "controversial relationships" with Wandahsega, all were cross-examined about any alleged bias against him.  Ultimately, the jury

believed their testimony, and "[a]ll reasonable inferences and resolutions of credibility are made in the jury's favor." *See United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012). The fact that Gudwer, Maycroft, and H.D.W. might have been biased against Wandahsega does not render their testimony insufficient for a conviction. *See United States v. Bailey*, 444 U.S. 394, 414–15 (1980) ("It is for [jurors] and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). The jury was entitled to credit their testimony, which was wholly consistent with the rest of the evidence presented at trial.

Finally, Wandahsega contends that the government failed to prove that Wandahsega knew that he was engaging in sexual conduct with H.D.W. because, if he did engage in such conduct, it could have occurred during an alcohol-related blackout. But as the government's expert witness testified, "you are up on your feet, you're moving, you're doing actions, but you are not recording those memories" during a blackout. This is in contrast to "passing out," when one is "unconscious" and in "a comatose state." Blackouts accordingly affect one's ability to store and retrieve memories of events that occurred during the blackout but, according to the government's expert witness, do not affect one's ability to complete intentional acts or to differentiate right from wrong. The jury therefore had sufficient evidence to rationally conclude that Wandahsega knew that he was engaging in sexual conduct with H.D.W., even if he had been blacked out at the time. Accordingly, the district court did not err in denying Wandahsega's motion for a judgment of acquittal.

## H. Wandahsega's sentence

We now turn to Wandahsega's challenges to his sentence. He makes three challenges to the procedural reasonableness of his sentence, and one challenge to its substantive reasonableness.

A sentence is procedurally reasonable if the district court "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other [18 U.S.C.] § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the

advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). If the court's sentence was procedurally sound, then we "consider the sentence's substantive reasonableness under an abuse-of-discretion standard, taking into account the totality of the circumstances, including the extent of a variance from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007). For sentences within the Guidelines range, we "may, but [are] not required to, apply a presumption of reasonableness." *Id.*

### 1.    *Enhancement for a pattern of prohibited sexual conduct*

Wandahsega first argues that his sentence is procedurally flawed because enhancing his offense level under § 4B1.5(b)(1) of the Sentencing Guidelines was not supported by a preponderance of the evidence. Section 4B1.5(b)(1) provides for a five-level enhancement when "the defendant's instant offense of conviction is a covered sex crime . . . and the defendant engaged in a pattern of activity involving prohibited sexual conduct." A defendant engages "in a pattern of activity involving prohibited sexual conduct if[,] on at least two separate occasions, the defendant engaged in prohibited sexual conduct with a minor." U.S. Sentencing Guidelines Manual § 4B1.5 cmt. n.4(B)(i).

Wandahsega argues that the evidence does not support a finding of at least two separate occasions of prohibited sexual conduct with H.D.W., and further argues that the district court erred in counting as one occasion the very conduct underlying the crime of conviction. Counting the conduct underlying the crime of conviction as one instance of conduct supporting the application of § 4B1.5, he argues, amounts to impermissible "double counting" because Wandahsega's base offense level already accounts for the offense of conviction.

But according to the Sentencing Commission's commentary to § 4B1.5, "[a]n occasion of prohibited sexual conduct may be considered . . . without regard to whether the occasion occurred . . . during the course of the instant offense." U.S. Sentencing Guidelines Manual § 4B1.5 cmt. n.4(B)(ii). Binding caselaw also supports the proposition that the two required occasions of prohibited sexual conduct for § 4B1.5(b)(1)'s enhancement may include the instant offense of conviction. *See United States v. Al-Cholan*, 610 F.3d 945, 954 n.4 (6th Cir. 2010) ("These two separate occasions [for § 4B1.5(b)(1)'s enhancement] may include the instant

offense, and prior occasions need not have resulted in a conviction to qualify." (internal quotation marks omitted)); *see also United States v. Broxmeyer*, 699 F.3d 265, 285 (2d Cir. 2012) ("[The defendant's] conviction on Count Three clearly provides one of the two occasions of prohibited sexual conduct necessary to establish a pattern of activity."). Wandahsega has cited no contrary authority, aside from the dissent in *Broxmeyer*. The district court therefore did not err in counting the conduct underlying Wandahsega's conviction for the purposes of applying § 4B1.5(b)(1).

Wandahsega also argues that a preponderance of the evidence does not support a finding of a pattern of activity involving prohibited sexual conduct. At trial, however, H.D.W. testified that his father had touched his genitals more than one time on different days. Dr. Judy further testified that H.D.W. said that Wandahsega had touched him on two separate occasions a number of days before going to the hospital. And during H.D.W.'s second forensic interview with Ruleau, which was not admitted at trial but was presented at the sentencing hearing, H.D.W. reaffirmed that his father had touched him multiple times. The district court's factual finding that Wandahsega had engaged in a pattern of prohibited sexual conduct with H.D.W. was therefore not clearly erroneous.

### 2. *Enhancement based on acquitted conduct*

In his second procedural challenge to his sentence, Wandahsega contends that the district court erred in using conduct for which he was acquitted (aggravated sexual abuse) to enhance his sentence under § 2A3.4(c)(1) of the Guidelines. Section 2A3.4(c)(1) of the Guidelines provides that if an offense involves "criminal sexual abuse or attempt to commit criminal sexual abuse," then the sentencing court should apply § 2A3.1 of the Guidelines. Section 2A3.1, which addresses sentencing for criminal sexual abuse, provides for a base offense level of 30, whereas § 2A3.4, which addresses sentencing for abusive sexual *contact*, provides for a base offense level of 20. Sexual abuse consists of, among other things, "knowingly . . . engag[ing] in a sexual act with another person if that other person is . . . incapable of appraising the nature of the conduct." 18 U.S.C. § 2242(2)(A). Criminal sexual abuse involves a sexual act rather than sexual contact. *See* 18 U.S.C. § 2242. A sexual act is defined as:

(A) contact between the penis and the vulva or the penis and the anus, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight;

(B) contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus;

(C) the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; or

(D) the intentional touching, not through the clothing, of the genitalia of another person who has not attained the age of 16 years with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.

*Id.* § 2246(2).

The district court applied § 2A3.1 to calculate Wandahsega's offense level because he was charged with aggravated sexual abuse in addition to abusive sexual contact. It concluded that, although Wandahsega had been acquitted of aggravated sexual abuse, the government had proven *by a preponderance of the evidence* that Wandahsega had committed such abuse. The court based this conclusion on H.D.W.'s testimony and his statements to other witnesses:

> At one point he describe[d] the act that [Wandahsega] was perpetrating on him to the point where it caused pain. That's in the context of a discussion about his butt hole being hurt. He also talk[ed] about contact with his, where his pee comes out and where his poop comes out. And he described [Wandahsega] using his hands to accomplish that, those sexual acts.

Wandahsega contends that (1) "the use of acquitted conduct to enhance a sentence defies notions of justice," and (2) the allegations of sexual abuse were not proven by a preponderance of the evidence. He cites dissenting opinions and an out-of-circuit district court opinion to highlight the alleged injustice of using acquitted conduct to determine a defendant's sentence. But controlling caselaw explicitly allows sentencing courts to consider such acquitted conduct. In *United States v. Watts*, 519 U.S. 148 (1997), for example, the Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157. An en banc panel of this court similarly held that "the district court's consideration of acquitted conduct in sentencing passes constitutional muster . . . insofar as

enhancements based on acquitted conduct do not increase a sentence beyond the maximum penalty provided by the United States Code." *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc). Because the district court determined that the government had proven by a preponderance of the evidence that Wandahsega committed criminal sexual abuse and did not sentence Wandahsega beyond the maximum penalty provided for by the statute, the court correctly concluded that it could consider the sexual abuse for which Wandahsega was acquitted in determining his sentence.

Nor did the district court commit clear error in determining that the government had proven by a preponderance of evidence that Wandahsega had committed criminal sexual abuse by engaging in sexual acts with H.D.W. H.D.W. testified that his father had touched H.D.W.'s privates—where he "poop[s] and pee[s]." And Dr. Judy testified that H.D.W. said that, a number of days prior to H.D.W.'s hospital visit, Wandahsega had touched H.D.W.'s "penis and put his finger up his rectum on occasion." Those incidents fit within the definition of a sexual act, which includes "the penetration, however slight, of the anal or genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(2)(C). And because H.D.W. was "incapable of appraising the nature of the conduct" at six years of age, the government proved by at least a preponderance of the evidence that Wandahsega committed sexual abuse. *See id.* § 2242(2)(A).

Even without the DNA evidence, which Wandahsega contends was "essentially meaningless," the district court found that H.D.W. was credible. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *United States v. Esteppe*, 483 F.3d 447, 452 (6th Cir. 2007) ("We afford the district court's credibility determinations regarding witness testimony great deference . . . ."). The district court therefore did not err in applying § 2A3.1 of the Guidelines to Wandahsega's sentence.

**3.          *Special assessment under the Justice for Victims of Trafficking Act***

Wandahsega's third procedural challenge to his sentence concerns the imposition of a $5,000 special assessment under the Justice for Victims of Trafficking Act (JVTA) of 2015, 18 U.S.C. § 3014(a)(2).  The JVTA provides that, in addition to the standard special assessment against those convicted of felonies under 18 U.S.C. § 3013, "the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under . . . chapter 109A (relating to sexual abuse)."  *Id.* § 3014(a)(2).  Defendants have "20 years after the release from imprisonment" to pay the assessment.  *Id.* §§ 3014(g), 3613(b).  At sentencing, the district court imposed the special assessment without making a detailed factual finding of Wandahsega's nonindigence, but "detailed findings are not necessary where it can be inferred that the district court considered the defendant's ability to pay and other factors required by law."  *See United States v. Powell*, 423 F. App'x 602, 610–11 (6th Cir. 2011).

Wandahsega contends that the district court erred in imposing the JVTA special assessment because he was indigent at the time of sentencing.  He was found eligible for court-appointed counsel in the district court, and the court determined that he would be unable to pay a fine.  Moreover, the PSR stated that Wandahsega has never had a job earning more than $10 per hour, that he has no assets other than a checking account containing $200, and that he has $30,000 in outstanding medical bills.  But the PSR also said that Wandahsega "believes he will obtain employment with Hannahville Indian Community upon his release."  The PSR therefore concluded that, although Wandahsega could not "satisfy a lump sum payment in the advisory fine range," he "may be able to make incremental payments towards a financial sanction."

Because Wandahsega did not object to the $5,000 special assessment before the district court, he "may obtain relief on appeal only if the error is 'plain' and 'affects substantial rights.'" *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc) (quoting Fed. R. Crim. P. 52(b)).  Section 3014 does not define the term "indigent," but this court has held that in assessing indigency, the court must resolve two basic questions:   "(1) Is the defendant impoverished *now*; and (2) if so, does the defendant have the means to provide for himself so that he will *not always* be impoverished?"  *United States v. Shepherd*, -- F.3d --, No. 18-3993,

2019 WL 1925640, at *3 (6th Cir. May 1, 2019) (emphasis in original). We may therefore consider a defendant's future earning potential in determining indigency. *Id.*

Wandahsega argues that he is currently impoverished due to his outstanding debts and lack of assets. He further contends that his substance-abuse and mental-health issues impede his future ability to earn money, as does a federal sex-offense conviction on his record. Contrary to his argument, however, the PSR states that Wandahsega "believes he will obtain employment with Hannahville Indian Community upon his release." And Wandahsega does not address why he would be unable to earn money while incarcerated. *See United States v. King*, 466 F. App'x 484, 489–90 (6th Cir. 2012) (upholding the imposition of a fine despite the defendant's current lack of ability to pay it, where he could participate in the Bureau of Prisons' Financial Program to work the fine off). Even if Wandahsega should be classified as impoverished now, and even if he earns only a minimum hourly wage when released from prison, he has not demonstrated that he will be unable to pay the assessment in increments over a twenty-year period.

Furthermore, the fact that Wandahsega qualified for court-appointed counsel "is probative but not dispositive of whether [he] is indigent under § 3014." *Shepherd*, 2019 WL 1925640, at *4. District courts may appoint counsel to defendants if they are "financially unable to obtain adequate representation," 18 U.S.C. § 3006A(a), but "the standard of financial inability is 'something less than indigency or destitution.'" *Brown v. United States*, 716 F. App'x 488, 492 (6th Cir. 2017) (quoting *United States v. Harris*, 707 F.2d 653, 660 (2d Cir. 1983)). "Indigency is a more dire condition than simply living paycheck-to-paycheck: it summons the thought of one who earns no paycheck at all and instead relies on others for life's basic necessities." *Shepherd*, 2019 WL 1925640, at *3.

Finally, the JVTA special assessment is not discretionary. *See* 18 U.S.C. § 3014(a)(2) ("[T]he court *shall* assess an amount of $5,000 on any non-indigent person . . . ." (emphasis added)). It is akin to a fine imposed as part of a sentence. For fines under the Sentencing Guidelines, the district court "shall" impose a fine and the defendant bears the burden of proving indigency. U.S. Sentencing Guidelines Manual § 5E1.2. Wandahsega has failed to show that the district court plainly erred in concluding that he failed to meet that burden. He has also failed to

demonstrate that any alleged error by the district court affected his substantial rights, as required under the plain-error standard.

### 4. *Substantive reasonableness of the sentence*

Finally, Wandahsega contends that his 288-month (24-year) sentence is substantively unreasonable because it is excessive in light of the purposes of sentencing. For a sentence to be substantively reasonable, "it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes" of § 3553(a). *United States v. Vowell*, 516 F.3d 503, 512 (citation and internal quotation marks omitted). This court applies a rebuttable presumption of substantive reasonableness to a within-guidelines sentence. *Vonner*, 516 F.3d at 389. Demonstrating that a below-Guidelines sentence is unreasonable "is even more demanding." *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008).

Wandahsega has not explained why the district court's sentence is not proportionate to the seriousness of the offense for which he was convicted, nor has he explained in more than a conclusory manner why the sentence is greater than necessary to comply with the purposes of § 3553(a). In fact, the district court departed from the Sentencing Guidelines and varied downward four levels when sentencing Wandahsega because it found that the Guidelines range of 360 months to life imprisonment was "greater than necessary."

To determine the sentence, which ended up being 72 months below the Guidelines range, the district court carefully considered each of the factors set out in § 3553(a) and explained the reasoning behind the sentence. Wandahsega therefore has not met his heavy burden of demonstrating that his below-Guidelines sentence is unreasonable. The district court therefore did not abuse its discretion in sentencing Wandahsega to 288 months of imprisonment.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** all aspects of the district court's judgment.